FILED
2024 May-28 AM 10:45
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION**

| | |
|---|---|
| JOSHUA BONDESON, ZACHARY BRELAND, SHERRIE MAINE, RICKY MASON, JAIME McCORMICK, MICHAEL NORWOOD, PHILIP VANDIVER, CHRISTOPHER BYRD, BENJAMIN EASTMAN, CORY KANNEGIETER, SHAWN LAABS, EMILY PADILLA, RICHARD MACK, SKYLER BUNCE, DOUG VONFELDT, BRIAN WEDEN, and MATTHEW BIGELOW, individually and on behalf of the Religious Class and all others similarly situated, | CLASS ACTION<br><br>Case No. _____<br><br><br>CLASS ACTION COMPLAINT FOR VIOLATION OF RIGHTS UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964<br><br>*Jury Trial Demanded* |
| Plaintiffs, | |
| v. | |
| UNITED LAUNCH ALLIANCE, LLC, | |
| Defendant. | |

**CLASS ACTION COMPLAINT & DEMAND FOR JURY TRIAL**

Plaintiffs Joshua Bondeson, Zachary Breland, Sherrie Maine, Ricky Mason, Jaime McCormick, Michael Norwood, Philip B. Vandiver, Christopher Byrd, Benjamin Eastman, Cory Kannegieter, Shawn Laabs, Emily Padilla, Richard Mack, Skyler Bunce, Doug VonFeldt, Brian Weden, and Matthew Bigelow (collectively "**Plaintiffs**"), for themselves and on behalf of all others similarly situated, allege, upon personal knowledge as to themselves and upon information and belief as to others, as follows:

1

## I.  INTRODUCTION

1.  This is a class action brought by former employees of United Launch Alliance ("**ULA**" or "**Defendant**"), alleging that the Defendant violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e-2 *et seq.* ("**Title VII**") by engaging in a comprehensive pattern and practice of discrimination relating to its COVID-19 vaccination mandate (the "**Mandate**" or "**vaccination mandate**").

2.  The gravamen of this Complaint is that ULA discriminatorily denied more than 100 religious accommodation requests that ULA determined qualified for a potential religious accommodation under Title VII. Hereafter, these employees are collectively referred to as the "**Religious Class**."  Plaintiffs are a small subset of the Religious Class, and are among those whose accommodation requests were denied. Demonstrating the company's animus towards the Religious Class, ULA treated similarly situated secular employees who submitted medical exemption and accommodation requests more favorably than the Religious Class.  ULA also retaliated against the entire Religious Class.

3.  Citing pre-textual justifications for the mass denial of the Religious Class employees' requests for religious accommodation, Constantina Wiggs ("**Wiggs**"), a Human Resources official based in ULA's rocket production facility in Decatur, Alabama, explained to the Religious Class that accommodating their requests would constitute an "undue burden" on its business because of the collective burden of accommodating the 100 plus employees would constitute a cumulative undue burden.

4.  Critically, before advancing this justification, ULA determined Religious Class members possessed sincere religious beliefs in conflict with receiving a COVID-19 vaccine and therefore were entitled to protection under Title VII.

5.   In other words, according to ULA, each member of the Religious Class's Title VII rights were contingent on the number of other employees who asserted their Title VII rights. ULA did not individually assess whether it could accommodate each employee's religious beliefs and practices short of undue hardship. Rather ULA concluded that if it accommodated one employee, it may potentially need to accommodate all employees. ULA therefore concluded the hypothetical collective burden meant that no employee was entitled to an accommodation.

6.   In contrast, ULA was somehow able to evaluate medical exemption and accommodation requests and identify medical accommodation options that would not constitute an undue burden.

7.   ULA's denial of religious accommodations was counterfactual, and unlawful on a corporate-wide level, for a number of independent reasons.

8.   First, there were many low cost and no-cost means ULA could have used to accommodate the Religious Class. Most glaringly, ULA refused to offer regular COVID-19 testing as an accommodation option. ULA was aware that COVID-19 tests were available for free or low-cost throughout the country during the relevant timeframes, including where Religious Class member's worked. ULA conceded, both implicitly and explicitly, that the vaccines are incapable of preventing COVID-19 infection and transmission. As such, testing is and was a more accurate and reliable countermeasure against COVID-19 than vaccination. If ensuring workplace safety had been ULA's real goal, then regular testing was a solution that should have been administered, for both vaccinated and unvaccinated employees alike, regardless of job role.

9.   ULA closely tracked COVID-19 cases within its workforce.  The company recorded the highest number of COVID-19 infections among its employees as the percentage of vaccinated employees *increased*. Upon information, when ULA executed its mass denial of religious accommodation requests, the overwhelming majority of its work force had been vaccinated. In

3

January 2022, Tory Bruno, ULA's CEO ("**Bruno**"), publicly announced that ULA had achieved a 99% vaccination level across the company. However, during that same month, ULA saw a very large spike in positive COVID-19 cases in its workforce. And consistent with this large spike of COVID-19 cases attributable to vaccinated employees, members of the Religious Class recall that ULA vaccinated employees were contracting COVID-19 at very high rates during the relevant timeframes. Notwithstanding these known realities, when denying all religious accommodation requests, ULA relied on the counterfactual justification that the mandated vaccines were "effective." Any burden purportedly experienced by ULA was necessarily premised on the efficacy of the medical procedure it mandated, and ULA knew or should have known by reason of its own experience that the vaccines were not effective in preventing COVID-19 infection and transmission. Consequently, ULA instituted a corporate policy of personal protection, and engaged in repeated coercion against the Religious Class, insisting that they violate their religious beliefs in exchange for personal protection.

10. Second, there were many other low-cost and no-cost accommodation options available, such as recognizing natural immunity, enhanced safety protocols, temporary telework, voluntary schedule swapping, or any combination of these options. ULA's refusal to recognize immunity derived from prior COVID-19 infection—"natural immunity"—as satisfying its immunization requirement or as an accommodation option is especially confounding. In the context of COVID-19, natural immunity's desirable relative efficacy has been repeatedly confirmed in the scientific literature.[1] ULA had actual knowledge through its own business records which will demonstrate that its vaccinated employees were contracting COVID-19 at incredibly high rates during the

---

[1] *See, e.g.,* The Lancet, *Past SARS-CoV-2 infection protection against re-infection: a systematic review and meta-analysis* (Feb. 16, 2023), *available at* https://www.thelancet.com/article/S0140-6736(22)02465-5/fulltext (last accessed May 24, 2024).

relevant timeframes, likely at even higher rates than its unvaccinated employees entitled to protection under Title VII, especially those possessing natural immunity. Bruno acknowledged the efficacy of natural immunity in a September 2021 Town Hall presentation, sent to all employees. The company even originally allowed serological proof of antibodies against COVID-19 gained through prior infection and recovery (i.e., natural immunity) as grounds for outright exemption from the Mandate. The fact that natural immunity has demonstrated superiority to vaccination alone should be unsurprising given that vaccines merely seek to artificially mimic the body's natural immune response to disease.  Natural immunity, through centuries of scientific research, has consistently proven to be superior to artificial immunity derived from vaccination. Nevertheless, despite this commonly understood scientific reality—which ULA clearly understood—ULA refused to allow proof of natural immunity as a religious accommodation to the Mandate, a no-cost option that would have caused no burden whatsoever to the company.

11. However, because its CEO, Bruno, has a particular animus against employees whose religious practices preclude vaccination, ULA predetermined it was not going to consider any reasonable accommodation options for religious employees, and revoked the natural immunity option because it would have allowed religious employees to keep their jobs. In the corporate-wide Town Hall presentation, Bruno communicated that he personally believed an unvaccinated person was responsible for the death of a member of his family. However, COVID-19 transmission from one person to another is not tracked by bar code, and Bruno publicly acknowledged that vaccinated persons are fully capable of contracting and transmitting the virus. The incoherence of Bruno's blaming non-vaccination for the death of a family member signaled that the company simply would not tolerate non-vaccination for religious reasons.  ULA, from the top levels of the company, had predetermined it would provide no religious accommodation under any circumstances, and

was "motivated" to avoid accommodating religious practices the company abhorred. *See EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 774, (2015) (holding that Title VII's disparate treatment provision "prohibits actions taken with the *motive* of avoiding the need for accommodating a religious practice"). Unlike employers across the country who managed to provide accommodations to vaccination requirements, including healthcare facilities dealing with those most vulnerable COVID-19, ULA ignored the numerous accommodation possibilities, including COVI-19 countermeasure options it had already provided.

12. In contrast, ULA did provide medical accommodation to unvaccinated employees with secular reasons for declining vaccination. Apparently, the perceived risks posed by unvaccinated employees in the workforce were perfectly fine, provided the employee declined vaccination for secular reasons instead of for religious motivations.

13. Third, the business costs and significant burdens ULA voluntarily embraced by mass denying religious accommodations far outweighed any burden associated with providing any of the low-cost and no-cost accommodation options available. Had it accommodated the Religious Class, the company would have avoided significant costs. However, ULA predetermined, without individually analyzing each employee's request to determine if it could accommodate such employee short of undue burden, that it would not accommodate one single religious accommodation request. This included members of the Religious Class who had worked in a 100% remote capacity since approximately March of 2020 and those that worked in buildings that were subject to renovation and would be closed into early 2022, necessitating remote work. Likewise, had ULA simply provided any of the many low cost and no-cost reasonable accommodations available to employees entitled to protections under Title VII, it would have saved the company tremendous self-imposed costs.

14. Plaintiffs were experienced and possessed exemplary performance records. The business costs of losing many highly trained, specialized, and productive employees (and the significant expenses of recruiting, rehiring, and training replacements) were substantial costs ULA suspiciously embraced. In ULA's campaign to purge the maximum number of religious employees with religious practices it could not tolerate, ULA embraced self-inflicted wounds to further its discriminatory objectives. The extraordinary and irrational business costs were not only acceptable to ULA, but the self-inflicted wounds were vigorously pursued and executed due to class-wide religious animus.

15. The United States Supreme Court has reiterated that otherwise illogical employment decisions give rise to an inference of discriminatory animus. *See Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978) (in justifying the presumption of intentional discrimination in Title VII cases, courts presume that "people do not act in a totally arbitrary manner, without any underlying reasons, especially in a business setting. Thus, when all legitimate reasons for [taking adverse action against an employee] have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts only with some reason, based his decision on an impermissible consideration. . . .").

16. And the Supreme Court's recent ruling in *Groff v. DeJoy, Postmaster Gen.*, 143 S. Ct. 2279 (2023) makes clear that an "employer must show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business." *Id*. at 2295 (internal citations omitted).

17. There was no credible justification for terminating so many religious employees whose religious beliefs precluded them from receiving a COVID-19 vaccine. Plaintiffs were high-performing employees that contributed substantially to ULA's success. Businesses typically do

not terminate high-performing employees during a labor shortage. Likewise, businesses that rely highly technical expertise gained through years' of experience, like ULA, typically do not terminate seasoned and trained employees.  As more fully detailed below, ULA cannot overcome *Groff's* undue burden standard, or the pre-*Groff* standard, and the company's illogical and counterproductive business decisions generate strong inferences of unlawful company-wide discrimination.

18. These are the kinds of "companywide policies" and "consistent practices" that the Supreme Court held in *Dukes* invite class action treatment. *Wal-Mart Stores v. Dukes*, 564 U.S. 338 (2011). When a company discriminates againsts large swaths of its employees at once, it should not be surprised to find itself defending against all the mistreated employees at once. This case fits comfortably within Federal Rule of Civil Procedure ("**FRCP**") Rule 23.

19. Plaintiffs and those similarly situated seek damages, including back pay, front pay, liquidated damages, punitive damages, lost benefits, compensatory damages, damages for emotional distress, pain and suffering, reasonable attorneys' fees and costs, declaratory relief, injunctive relief, as well as any other relief to which Plaintiffs are entitled.

## II.    JURISDICTION AND VENUE

20. This action is authorized and instituted pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 over federal questions raised under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.

21. Venue is proper in the Northern District of Alabama under 42 U.S.C. § 2000e-5(f)(3). ULA maintains significant operations in the Northern District of Alabama and this District is where ULA personnel who committed the unlawful employment practices were located when engaging

in the discriminatory practices alleged herein. ULA, by and through its religious exemption and accommodation committee (the "**Religious Accommodation Committee**") and its lead member, Wiggs, stationed in Decatur, Alabama, communicated religious accommodation denials from this District. Jennifer Morgan and Lourie Bradley both worked alongside Wiggs on the Religious Accommodation Committee from Defendant's Decatur, Alabama, location. As part of the Committee, they reviewed and made decisions related to religious accommodation requests. Wiggs, the Chair of the Religious Accommodation Committee, participated significantly in the denial of Religious Class members' religious accommodation requests, issued the final determination on religious accommodation requests, and communicated the decision in writing to members of the Religious Class.[2] Venue in this District is appropriate under 42 U.S.C. § 2000e-5(f)(3) on alternative grounds because this District is also where records relevant to the unlawful practices alleged herein are accessible, maintained, and/or administered.

## III.  CONDITIONS PRECEDENT

22. Plaintiffs filed timely charges with the EEOC indicating that ULA engaged in a pattern and practice of discrimination against at least 109 employees.  Plaintiffs Emily Padilla and Rich Mack, as well as other members of the Religious Class filed EEOC charges notifying the EEOC and ULA of their intent to file a representative action relating to ULA's widespread pattern and practice of religious discrimination and retaliation.[3] Multiple of these Plaintiffs, including Emily Padilla and Rich Mack, received a Notice of Right to Sue from the EEOC.

---

[2] *See*, *e.g.*, **Exhibit 1**, Plaintiff Brian Weden's Reasonable Accommodation Decision Form, distributed and signed by Tina Wiggs; **Exhibit 2**, Plaintiff Emily Padilla's Reasonable Accommodation Decision Form, distributed and signed by Tina Wiggs; and **Exhibit 3**, Plaintiff Joshua Bondeson's Reasonable Accommodation Decision Form, distributed and signed by Tina Wiggs.

[3] *See* **Exhibit 4**, EEOC Charge of Discrimination filed by Emily Padilla, highlighting Title VII class charges against ULA ("I believe I and a class of similarly situated employees have been

## IV.  PARTIES

### A.    **Defendant**

23. ULA is a privately held limited liability company, established under the laws of the State of Delaware, authorized to and doing business in Alabama.

24. ULA was formed in 2006 to construct and launch rockets for a variety of customers.

25. As a company engaged in an industry affecting commerce with fifteen or more employees, ULA is an "employer" under 42 U.S.C. §2000e(b) and is otherwise governed by Title VII of the Civil Rights Act of 1964 and other federal anti-discrimination statutes governing employment matters.

26. ULA's customers include NASA, the United States Space Force, and the National Reconnaissance Office ("**NRO**").

27. For these government customers, ULA's services include manufacture of rockets and timely launching of rockets carrying satellites for various governmental purposes.

28. ULA's largest rocket production facility is located at 1001 Red Hat Road in Decatur (Morgan County) Alabama.

29. ULA employs a total of about 2900 persons.

30. In 2020, ULA employees were deemed "essential" for purposes of federal COVID-19 regulations.

31. From the onset of the COVID-19 emergency, ULA actively monitored medical developments as well as federal, state, and locally imposed restrictions.

---

discriminated against because of . . . religion"); *see also* **Exhibit 5**, EEOC Charge of Discrimination filed by Richard Mack (placing ULA on notice of Title VII class claims).

32.  During 2020 and 2021, ULA implemented a number of measures to address the threat of COVID-19 to its employees.

33.  One of those measures required the ULA employees to wear face masks.

34.  Upon information and belief, during this period, ULA was able to seamlessly operate its business with unvaccinated employees in its workforce, while observing enhanced safety protocols.  These safety countermeasures are analogous, or virtually identical, to accommodations requested by Plaintiffs during the religious accommodation process.

35.  By the end of 2021, ULA had confirmed approximately 300 COVID-19 infections among its employees.  On information and belief, significant numbers of these infections were attributable to ULA employees who had already been vaccinated against COVID-19.

36. Further, ULA cannot confirm that any of its employees contracted COVID-19 in the ULA workplace, or which employees were responsible for the spread of COVID-19 amongst it workforce.  COVID-19 transmissions are not tracked by bar code, and ULA employees intermingled with others outside of the workplace and were exposed to the threat of COVID-19 in 2020 and 2021, including outside of ULA facilities.

37. The confirmed COVID-19 infections among its employees represented about ten percent (10%) of ULA's total workforce.

38.  With COVID-19 countermeasures in place, ULA completed six rocket launches in 2020 and five rocket launches in 2021. This compares to ULA completing five rocket launches in 2019, pre-COVID. ULA was able to accommodate the COVID-19 difficulties in stride during 2020 and 2021, and did not miss a single launch date in 2020 or 2021 due to COVID-19.

**ULA's Vaccination Mandate**

39. The Pfizer-BioNTech COVID-19 vaccine received Emergency Use Authorization on or around December 11, 2020. The Moderna and Johnson & Johnson COVID-19 vaccines soon thereafter also gained Emergency Use Authorization.

40. On August 18, 2021, ULA formally instated its Mandate, requiring all ULA employees to receive the first dose of the Pfizer or Moderna vaccine, or a single dose of the Johnson & Johnson vaccine, by September 30, 2021, and the last dose of the Pfizer and Moderna vaccines by October 31, 2021.[4]

41. On September 2, 2021, ULA notified employees that they "have heard employee concerns about whether there would be time to secure documentation for medical exemptions."[5] To accommodate medical accommodations, ULA moved the effective policy date back to October 1, 2021, making October 29, 2021, the deadline to receive a first dose of an available COVID-19 vaccine.

42.    In justifying the Mandate, ULA relied on provably false rationales. ULA's Mandate-related communications claimed under the "Supporting the Health of our Team Supports the Security of our Nation" heading, that "**Vaccinations prevent transmission of COVID-19**."[6] Because ULA's vaccinated employees were contracting COVID-19 during the relevant timeframes, and reporting their infections to ULA, ULA was well-aware that this justification was counterfactual at the time that it sent this email out to all employees.

---

[4] *See* **Exhibit 6**, August 18, 2021, Email from Tory Bruno to ULA Workforce.

[5] *See* **Exhibit 7**, September 2, 2021, Email from Tory Bruno to ULA Workforce.

[6] *Id*. (Emphasis added).

43. The then head of the Centers of Disease Control and Prevention ("**CDC**"), Rochelle Walensky, publicly announced in August of 2021—before Defendant instituted the Mandate—that the vaccines were incapable of preventing infection and transmission.[7]

44. Further, ULA's own business records demonstrate that its vaccinated employees were contracting COVID-19 at high rates at the relevant times, and, therefore, ULA had actual knowledge that the COVID-19 vaccines were incapable of preventing infection and transmission.

45. On September 9, 2021, President Biden signed Executive Order 14042, directing federal agencies to ensure that contracts covered by the order include a clause requiring the contractor comply with guidance by the Safer Federal Workforce Task Force (the "**Task Force**").

46. On September 24, 2021, the Task Force issued its COVID-19 Workplace Safety: Guidance for Federal Contractors and Subcontractors, which required covered contractors to ensure that all covered contractor employees are fully vaccinated for COVID-19, unless, consistent with Title VII and the ADA's requirements, the employee was legally entitled to an accommodation due to a disability or a sincerely held religious belief, practice, or observance.

47. The Task Force guidance recognized that federal contractors coming under Executive Order 14042 were required by federal law to make accommodations for religious objections to vaccination pursuant to Title VII.

### ULA's Religious Accommodation Process

48. ULA's HR department instituted a process dictating how employees were to apply for a religious or medical exemption. The policies allowed a Religious Exemption Request (ULA form

---

[7] *See* CNN, *Fully Vaccinated People Who Get a Breakthrough Infection Can Transmit the Virus,* (August 5, 2021), *available at* https://edition.cnn.com/us/live-news/coronavirus-pandemic-vaccine-updates-08-05-21/h_d2accec79fdc37f422d02c536828ea1e (Director Walensky stating that the COVID-19 vaccines worked "with regard to severe illness and death… [b]ut what they c[ouldn]'t do anymore is prevent transmission." (Last visited May 24, 2024)).

HR-126A) to be filed by employees with a sincerely held religious belief in conflict with receipt of a COVID-19 vaccine.

49. During the relevant time period, Plaintiffs and those similarly situated submitted the ULA Religious Exemption Request forms to the ULA HR Department, detailing their various religious conflicts with receiving a COVID-19 vaccine.

50. Plaintiffs and those similarly situated all submitted requests for religious accommodation to the Mandate or otherwise placed ULA on notice of their religious conflict precluding vaccination against COVID-19.

51. Each Plaintiff and each member of the Religious Class holds a sincere religious belief that prohibits them from injecting COVID-19 vaccines, as more specifically alleged herein below.

52. Religious Exemption requests were reviewed by the ULA Religious Accommodation Committee.

53. The Religious Accommodation Committee was a company-wide (corporate level) group comprised of the ULA Human Resources department heads. The Chairperson of the Committee was Wiggs, who is based in ULA's Decatur, Alabama facility. Other members of the Committee were Jennifer Morgan, Lourie Bradley, Amy Logsdon, Gillian Dale, Janet Williams, Noella Gutierrez, Mary Ann Milton, Jose Duenas, Kia Silverman, and Linda Wyman

54. The Religious Accommodation Committee received and reviewed over 100 requests for religious accommodation.

55. As part of its review of the religious accommodation requests, the Accommodation Committee determined and concluded that over 100 of the requesters presented a sincerely held

religious belief in conflict with vaccination, specifically noting that they "qualified under the sincerely held belief prong of the accommodation analysis."[8]

56. Ultimately, after validating the religious sincerity of each member of the Religious Class, the Religious Accommodation committee made the decision to deny all accommodation requests.

57. ULA made this decision divorced from any individualized assessment of the company's ability to accommodate each request based on the employee's place, position, job duties, responsibilities, or other specific circumstances of employment.

58. ULA did not meet with or discuss with any requester's local supervisors or managers to assess how an individual requester might be accommodated short of undue hardship.

59. In fact, Plaintiffs' managers were specifically excluded from participation in the accommodation decision making process. This means that the Religious Accommodation Committee took active steps *to not learn* each religious requestor's individual circumstances. The Religious Accommodation Committee did not learn of each requestor's actual job duties or whether it was possible to accommodate them without an undue burden to ULA's business.

60. As Chair of the Religious Accommodation Committee, Wiggs communicated the Committee's refusal to provide a religious accommodation decision to members of the Religious Class.

61. ULA purposefully did not include the employees' direct supervisors in meetings with the requesters because if it did, it would not be able to credibly deny reasonable accommodations as the Committee would have identified the many low cost and no cost accommodation options

---

[8] *See*, *e.g.*, **Exhibit 1**, Plaintiff Brian Weden's Reasonable Accommodation Decision Form, distributed and signed by Tina Wiggs; *see also* **Exhibit 2**, Plaintiff Emily Padilla's Reasonable Accommodation Decision Form, distributed and signed by Tina Wiggs; and **Exhibit 3**, Plaintiff Joshua Bondeson's Reasonable Accommodation Decision Form, distributed and signed by Tina Wiggs.

available for each employee.  ULA would have been confronted with the many open and obvious accommodation options available and then would have been unable to accomplish its goal to purge the maximum number of employees possessing disfavored religious practices in conflict with vaccination.

62. ULA managers and/or supervisors outside of the Religious Accommodation Committee were not given discretionary power to assess or allowed input into the determination whether an employee's exemption request could be accommodated without undue hardship to ULA.

63. Prior to discovering the full number of employees with religious practices in conflict with vaccination, ULA recognized scientific reality and allowed employees to submit proof of natural immunity as an exemption option to receiving a vaccine.  In other words, employees were seen as satisfying its immunization goals if they had been immunized naturally through prior infection and recovery.

64. Before mass denying religious accommodation requests, ULA previously allowed for serology testing and proof of naturally occurring COVID-19 antibodies from prior infection as the basis for a medical exemption to the Mandate, regardless of a religious or medical conflict with the Mandate.

65. Many members of the Religious Class possessed natural immunity through prior infection and recovery prior to the denial of their religious accommodation requests, which ULA had actual or constructive knowledge of.

66. ULA discontinued recognition of natural immunity as satisfying the Mandate's requirements because continuing that policy would have allowed too many employees with religious practices ULA deemed abhorrent to remain employed.

67. On information and belief, many members of the Religious Class requested that ULA recognize their natural immunity as satisfying the Mandate or otherwise consider their natural immunity as an accommodation option.  ULA refused these requests based on religious animus.

68. In a September 7, 2021, Town Hall Meeting led by Bruno, ULA posted the following slide as part of the presentation recognizing efficacy of natural immunity[9]:



69. Had ULA recognized natural immunity as satisfying the Mandate's immunization requirements, or offered it as a reasonable accommodation, as they originally allowed based on the fact that "COVID Antibodies Persist for at least 8 months and evidence similar levels of protection [to vaccination]," the company would have been unable to effectuate its desired outcome: to purge as many employees with disfavored religious practices as possible.

<strong>ULA's More Favorable Medical Exemption Process</strong>

70. While ULA denied every request for religious accommodation, ULA granted requests for accommodation based on medical conflicts with the Mandate.

---

[9] *See* **Exhibit 8**, "Antibody slide" from Town Hall Meeting Slideshow presented by Tory Bruno.

71. ULA explicitly informed employees that the "undue burden analysis" was different for employees seeking secular-based, medical accommodations to the Mandate than it was for those seeking religious accommodations to the Mandate.

72. Because non-vaccination was the outcome sought for both religious and medical accommodations, ULA cannot credibly claim it is an undue burden to accommodate non-vaccination for religious reasons, but not an undue burden to accommodate non-vaccination for medical reasons.

73. Upon information and belief, ULA employees Sean Barrett, Sean Larsen, Jeremy Lehman, and numerous other ULA employees were granted medical accommodations to the Mandate. However, ULA denied 100% of religious accommodation requests.

74. To accommodate ULA employees with a medical conflict with the Mandate, ULA offered some combination of the reasonable accommodations discussed herein, and could have easily done same for the entire Religious Class.

75. Accommodations granted for medical reasons were not offered to any member of the Religious Class.

76. As such, ULA treated secular employees more favorably than religious employees.

**Plaintiffs Appeal Accommodation Denials**

77. Many members of the Religious Class appealed their religious accommodation denials.

78. In the appeals, many members of the Religious Class went point by point to explain that accommodating them would not amount to an undue burden.

79. Many Religious Class members also discussed the minimal, and often non-existent, financial costs of accommodating them through regular testing. Many also provided detailed estimates of the minimal costs to accommodate their religious practices. Moreover, many

Religious Class members explicitly advised they would be willing to pay whatever costs were incurred to accommodate them.

80. Many Religious Class members advised ULA that refusing to grant a single religious accommodation based on an alleged "collective undue burden" was unlawful on a class-wide basis and notified ULA they would pursue legal action against ULA if it did not revoke their blanket unlawful policy to deny all religious accommodation requests without an individualized analysis as to whether ULA could accommodate said employee without an undue burden.

81. Many Religious Class members engaged legal counsel, who advised ULA their policies and practices related to religious accommodations to the Mandate were unlawful. As such, ULA possessed actual notice that its Mandate-related policies and procedures were unlawful, yet willfully persisted in violating the Religious Class's Title VII rights.

### ULA's Pretextual Justifications for the Mass Denial of Religious Accommodations

82. At the highest levels of the company, ULA willfully pre-determined that it would not perform individualized assessments of each unvaccinated employee's specific circumstances to determine whether a reasonable accommodation option was available. ULA failed to conduct individualized accommodation assessments for members of the Religious Class.

83. ULA could have accommodated the requests of Plaintiffs and those similarly situated without any hardship whatsoever through, among other available options: (1) periodic COVID-19 testing (which is a more reliable assurance of workplace safety than vaccination—because ULA's vaccinated employees were contracting COVID-19 at high rates from July to November of 2021— and testing was available for free or could have been paid for by Plaintiffs); (2) enhanced safety protocols for face-to-face meetings with ULA employees or clients, as those in place before the vaccination mandate; (3) temporary remote work; (4) voluntary schedule swapping with

vaccinated employees or employees demonstrating a negative COVID-19 test in the rare event in-person contact was required as a core job function; (5) recognition of natural immunity as an accommodation option; or (6) any combination of the above options.

84. ULA's claims of administrative and financial burden related to providing a testing option to religious employees demonstrates pretext. Throughout the country during the relevant timeframes, both state and federal governments offered free testing options. Further, many members of the Religious Class indicated to ULA they would personally incur the costs related to COVID-19 testing in an effort to preserve their careers.

85. Further, ULA's business records related to the relative infection rates between its vaccinated and unvaccinated workforce demonstrate pretext. Any administrative burdens related to a COVID-19 testing program during the relevant timeframes were overwhelmingly attributable to ULA's *vaccinated* employees.

86. Upon information and belief, ULA employees Lindsey Miller, Lucas Polaski, Dave Kuhns, Chuck Williams, Shawn Knox, and Michelle Kipp contracted COVID-19 after being fully vaccinated. These employees represent a minuscule fraction of ULA's vaccinated workforce who received a COVID-19 vaccine and subsequently tested positive for COVID-19. ULA had actual knowledge that its vaccinated employees were contracting COVID-19 when it took adverse actions against the Religious Class.

87. As a federal contractor, ULA adhered to strict contact tracing requirements throughout the pandemic. In fact, ULA sent monthly updates to its employees with the exact number of positive cases reported (while leaving out the vaccination status of each positive test). Those records show ULA knew at the time it denied accommodations to the Religious Class—and certainly when it terminated members of the Religious Class—that its vaccinated employees were contracting and

spreading COVID-19 at similar or even higher rates relative to its unvaccinated employees, and certainly higher than Religious Class members possessing natural immunity.

88. Despite actual knowledge of transmission risk amongst its vaccinated employees, ULA stopped its contact tracing for COVID-19 infections upon terminating members of the Religious Class.  ULA was not really concerned about "workplace safety," but rather was driven by a desire to rid itself of employees with religious practices the company could not tolerate. ULA utilized the Mandate as a convenient vehicle to accomplish its unlawful corporate goals.

89. Considering that multiple accommodation options were available that would have imposed less than a *de minimis* burden, and the inauthenticity of its undue hardship assertions, ULA acted with malice and recklessly disregarded Plaintiffs and those similarly situated rights under Title VII.

90. Upon information and belief, other companies across the country that implemented vaccination mandates: (a) recognized the COVID-19 vaccines inability to prevent infection and transmission, and/or (b) instituted testing protocols applicable to vaccinated and unvaccinated employees alike, and (c) granted the religious accommodation of regular testing for COVID-19.

91. Regular testing as an accommodation option was allowed by healthcare providers across the country, including those in Alabama, Colorado, Texas, Florida, and California, for religious employees who worked with the most vulnerable to COVID-19 in the country.  These employers, unlike ULA, recognized that testing was a more effective countermeasure than vaccination, which created a false sense of security for vaccinated healthcare providers and encouraged them to take risks with spreading COVID-19 as asymptomatic carriers.

**ULA Did Not Confirm Those Claiming to be Vaccinated**
**Actually Received a COVID-19 Vaccine, and Failed to Validate**
**that Vaccinated Employees Had Actually Generated an**
**Immune Response**

92. Upon information and belief, ULA did not validate, beyond a surface level review, employees who claimed to be fully vaccinated. On belief, some employees who claimed to be vaccinated against COVID-19 did not receive a COVID-19 vaccine.

93. Upon information and belief, for those ULA employees who submitted vaccination documents as proof of compliance with the Mandate, ULA failed to validate the authenticity of the submitted vaccination cards. On belief, there were ULA employees who obtained fake vaccination cards instead of actually injecting a mandated vaccine into their bodies.

94. Upon information and belief, ULA had knowledge (actual and/or constructive) that employees were submitting fake vaccination cards. Nonetheless, while claiming the safety of its workforce depended on universal vaccination, ULA did nothing to ensure employees were not submitting fake proof of vaccination.

95. ULA also did not validate that those who had submitted a vaccination card had actually elicited an immune response to the vaccine. ULA did not validate that vaccinated employees had generated antibodies against COVID-19.  But ULA had actual knowledge that many unvaccinated employees had elicited a strong immune response and had generated antibodies against COVID-19 through prior infection and recovery from the virus because the company, for a period, allowed proof of serological testing as satisfying its immunization requirement.

**Free COVID-19 Testing was Available Throughout the Country**

96. ULA asserted that the cost of testing every unvaccinated employee justified its claims of undue hardship. However, free testing was available throughout the country during the relevant timeframes.

97. Free testing was available in Alabama during the relevant period.[10]

98. Free testing was available in Colorado during the relevant period.[11]

99. Free testing was also available in Texas, Florida and California during the relevant period.

100. ULA has actual or constructive knowledge that free testing was available for its workforce during the relevant timeframe.

101. Further, in December 3, 2021, the White House had announced plans for full reimbursement of COVID-19 testing costs for employers.[12]

102. In addition, many Plaintiffs notified ULA that they would personally cover any testing costs associated with their respective accommodation if necessary.

103. All Plaintiffs maintain that they would have paid for their own testing costs if ULA had given them that option as part of their accommodation.

104. On January 10, 2022, President Biden's Department of Health and Human Services ("**HHS**") announced that as of January 15, 2022, all health insurers would be required to cover the full cost of at-home COVID-19 testing.[13]

---

[10] *See* CVS, *Free COVID-19 Test at 930 Winchester Rd., Huntsville, AL*, *available at* https://www.cvs.com/minuteclinic/clinic-locator/covid-19-testing/huntsville-covid-2748.html (last accessed May 24, 2024).

[11] *See* Covid Check Colorado, *Community Testing*, *available at* https://covidcheckcolorado.org/community-testing/ (last accessed May 24, 2024).

[12] *See* CNBC, *How to get the free at-home COVID tests promised by the White House,* (December 3, 2021), *available at* https://www.cnbc.com/2021/12/03/how-to-get-the-free-at-home-covid-tests-promised-by-white-house-.html (last accessed May 24, 2024).

[13] *See* U.S. Department of Health and Human Services Press Release, *available at* https://www.hhs.gov/about/news/2022/01/10/biden-harris-administration-requires-insurance-companies-group-health-plans-to-cover-cost-at-home-covid-19-tests-increasing-access-free-tests.html (last accessed May 24, 2024).

105.    On information and belief, time spent tracking COVID-19 infections (and any purported and attendant administrative burden), was overwhelmingly attributed to vaccinated employees. Thus, any purported administrative burden associated with tracking testing would be disproportionately associated with vaccinated employees.

**ULA's Knowledge of Severe Risks of Injury
Associated with the COVID-19 Vaccines
and Reckless Disregard of Religious Employee's Title VII Rights**

106.    In justifying its vaccination mandate, ULA explicitly stated that the available vaccines were "safe." Bruno asserted this statement as an irrefutable fact in his early September 2021 Town Hall Meeting.

107.    However, ULA had actual and/or constructive knowledge at the time that the COVID-19 vaccines could not be guaranteed as safe, and in fact were not "safe" by any objective or reasonable measure.

108.    Despite actual and/or constructive knowledge of adverse events related to the COVID-19 vaccine readily available after Plaintiffs and those similarly situated submitted religious exemption requests, ULA required that religious and medically vulnerable employees submit to vaccination as a condition of employment.

109.    Despite clearly stated religious and medical reasons for declining vaccination, and that the vaccines at best may have provided an undefined level of personal protection, ULA — in reckless disregard of Plaintiffs' Title VII rights — insisted that Plaintiffs abandon their religious beliefs and expose themselves to potential vaccine induced harm as a continued condition of employment.

110.    Emergency Use Authorization ("**EUA**") Fact sheets ("**EUA Fact Sheets**") required for providers of the Pfizer, Moderna, and J&J COVID-19 vaccines, all contain a list of possible adverse reactions, including the possibility of severe allergic reaction.

111.    In addition, the EUA Fact Sheets cite myocarditis and pericarditis as potential adverse effects.

112.    ULA also had actual and/or constructive knowledge of vaccine adverse events through other sources, specifically through the Vaccine Adverse Event Reporting System ("**VAERS**").

113.    VAERS was established in 1990 and is overseen jointly by the CDC and the Food and Drug Administration ("**FDA**").

114.    VAERS provides a platform for individuals and healthcare providers to report adverse events to vaccines. The platform collects and aggregates the data of adverse events relating to all vaccines, including the COVID-19 vaccines.

115.    As of October 26, 2021, the number of deaths reported to VAERS as a result of the COVID-19 vaccines totaled over 13,422, while the total number of reported deaths from 30 years of VAERS reporting for all other vaccines totaled 9,183. In less than a full year of administration of the COVID-19 vaccines, there were over 4,000 more deaths reported after a COVID-19 vaccine than that for all vaccines administered over 30 years, combined.

116.    When ULA instituted its vaccination mandate in September of 2021, approximately 623,341 adverse events relating to the COVID-19 vaccine were reported to VAERS. These adverse events included approximately: 13,627 COVID-19 vaccine related deaths, 55,821 COVID-19 vaccine related hospitalizations, 74,368 COVID-19 vaccine related urgent care visits, 17,794 COVID-19 vaccine related cases of permanent disability, and 14,105 other life-threatening COVID-19 vaccine related incidents.

117.    On the date ULA instituted its vaccination mandate, VAERS data was publicly available and had been reported in the news. On belief, many ULA employees reported the shocking VAERS adverse event rates to ULA management.

118.    Despite knowledge of actual and suspected adverse events, ULA instituted its COVID-19 vaccination requirement on its employees, communicating that the COVID-19 vaccine was "safe."

119.    A United States Department of Health and Human Services ("**HHS**")-funded study evaluating the VAERS system was performed by Harvard Pilgrim Health Care, Inc. from December 2007, through September 2010, aggregating the medical records of 715,000 patients across the country, 376,452 of which were vaccine recipients. The study found that after comparing the medical records of vaccine recipients with the total number of events reported to VAERS, less than 1% of the total number of vaccine-induced adverse events were actually reported to VAERS.

120.    The VAERS underreporting problem is supported by the CDC's own safety data related to the COVID-19 vaccines.

121.    On or around December 13, 2020, the CDC introduced its smartphone-based program for COVID-19 vaccine recipients called "V-safe." The program allows for users to "quickly and easily share with CDC how you, or your dependent, feel after getting a COVID-19 vaccine."

122.    Out of the 10,094,310 registered users who submitted data to V-safe, 782,913 users (over 7.7%), reported a health event requiring medical attention, emergency room intervention, and/or hospitalization.

123.    Over 25% of V-safe users had an event requiring them to miss school or work, and/or prevented normal activities.

124.    Upon information and belief, ULA's own business records reflect employees who received a COVID-19 vaccine experienced similar rates of adverse events as revealed in the CDC's V-safe data.

**ULA Terminates Many Religious Employees
and Interferes with Unemployment Claims**

125.    After assessing the religious sincerity of employees who submitted a religious accommodation request and determining they indeed held sincere religious beliefs entitling them to protection under Title VII, ULA nevertheless, without any individual assessment whether any employee could be reasonably accommodated short of undue hardship, denied 100% of religious accommodation requests submitted by members of the Religious Class.

126.    ULA then took additional adverse employment action against many members of the Religious Class by terminating them.

127.    ULA treated these terminations as though they were "for cause" and/or that terminated employees had "voluntarily resigned".

128.    When terminated employees applied for unemployment benefits, ULA opposed claims for unemployment.

129.    As a result of ULA's decision to wrongfully terminate members of the Religious Class, class members suffered extended periods of lost wages, lost 401(k) contributions, lost vacation time, lost healthcare benefits, and future lost wages.  Terminated employees also suffered because of the stress and anxiety of losing their jobs and finding new employment, and because of ULA's continued attack against their unemployment benefits.

B.    **Plaintiffs**

**Matthew Bigelow**

130.    Plaintiff Matthew Bigelow ("**Bigelow**") worked for ULA for over 9 years. Bigelow was employed at ULA as a Configuration Analysis Specialist III - RS.

131.    Throughout his career, Bigelow performed well in his role, was qualified for his job, and had an exceptional performance record.

132.    ULA placed Bigelow on an involuntary leave of absence on October 29, 2021.

133.    ULA terminated Bigelow on November 11, 2021, for upholding his religious beliefs and practices in conflict with the Mandate.

134.    Bigelow is a Roman Catholic who believes that human life begins at conception and that abortion is tantamount to murder. As such, it is a sin in his system of religious beliefs to use medical products he understands to be created using aborted fetal cell lines. It is Bigelow's understanding that the Pfizer and Moderna vaccines used aborted fetal cell lines in their testing, development, and/or manufacture, and that the Johnson & Johnson vaccine used aborted fetal cells in the production of their vaccine. With this understanding, Bigelow is precluded from receiving one of the then available COVID-19 vaccines because they are the result of the taking of an innocent human life.

135.    Separately and independently, Bigelow must follow his conscience, given by God. He will not allow ingest a substance when his conscience tells him potential adverse effects potentially outweigh the benefits, and to do otherwise would be to violate his God-given and stewardship duties over his body, which he believes is a responsibility commanded by God. The only way that he will potentially contradict his conscience is if authoritative Catholic moral teachings dictate to the contrary, which he deemed not to be the case here.

136.    Bigelow requested a religious accommodation from ULA's COVID-19 vaccination policy because of his strongly held religious beliefs in conflict with receiving a COVID-19 vaccine.

137.    As explained above, ULA's accommodation committee denied Bigelow' religious accommodation request after verifying that he held a sincere religious belief in conflict with receipt of a COVID-19 vaccine.

138.    ULA pretextually refused to offer or otherwise provide any accommodation options because of Bigelow's disfavored religious beliefs.

139.    There were multiple no-cost and/or less than de minis cost accommodation options available that ULA could have provided to Bigelow. Specifically, ULA could have required Bigelow to be tested prior to entering facilities or performing any other role ULA determined required in-person contact.  At the time of Bigelow's termination, testing was available for free throughout the country. Bigelow also would have willingly paid out of pocket for testing in order to retain his job.

140.    In addition to the testing accommodation option, there were also multiple no-cost there were also multiple other no-cost and/or less than de minis cost accommodation options available that ULA could have provided to Bigelow. Bigelow was willing to bear any such costs personally in an effort to preserve his career and religious convictions.

141.    ULA did not address several low-cost and no-cost alternative reasonable accommodations available, including but not limited to: recognition of natural immunity, enhanced safety protocols, telework, schedule swapping with vaccinated employees if in-person meetings requiring proof of vaccination were an actual requirement for the job, or any combination of these options.

142.    During the height of the pandemic, from December 2020 (when COVID-19 vaccines became available) through October 2021, Bigelow contributed to the ongoing operation and success of ULA while unvaccinated and while preserving his religious convictions.

143.    ULA provided functional accommodations, consistent with Bigelow's religious convictions, during this period and allowed Bigelow to work unvaccinated while observing enhanced safety protocols. These safety protocols included some combination of six-foot social distancing policy; mask requirements; sanitizer was made easily available and encouraged; daily temperature checks before entering the facility unless the employee was vaccinated; and a general limitation of two people per company vehicle.

144.    Bigelow' sincerely held religious beliefs in conflict with vaccination could have been accommodated without any undue burden whatsoever and Bigelow would have accepted any of the numerous reasonable accommodation options.

145.    ULA did not engage in any interactive process calculated towards finding a reasonable accommodation, which the company would have identified had it engaged in an actual good faith accommodation process (which it did not).

146.    Prior to his termination, the building that Bigelow worked in was declared "safe" by the local health department, meaning the building no longer required entrants to mask, because 80% of the building had received an available COVID-19 vaccine.

147.    As a direct and proximate cause of ULA's discriminatory actions, Bigelow's finances were significantly and negatively impacted.

148.    In addition to financial loss, Bigelow suffered emotional and psychological harm while still employed at ULA from the months of uncertainty and repeated coercion to abandon his sincere religious beliefs in order to preserve his livelihood and career, all related to his unlawful

termination. As a result of the discriminatory treatment he experienced, Bigelow suffered from emotional distress which is or has been marked by some combination of feelings of despondency, social anxiety, loss of interest in leisure activities, and feelings of agitation, and irritability.

149.    Following his unlawful termination, Bigelow suffered emotional and psychological harm from the months of unemployment.

### Joshua Bondeson

150.    Plaintiff Josh Bondeson ("**Bondeson**") was employed by ULA for over 21 years. He worked as an Aerospace Production Technician at ULA's Decatur, Alabama site.

151.    Bondeson performed well in his role, was qualified for his job, and had an exceptional performance record.

152.    Bondeson is a Christian. As a Christian, Bondeson believes all human beings are made in the image in God. As a Christian, Bondeson believes life begins at fertilization and ends at natural death. Bondeson also believes the unjust taking of a human life is murder. As a Christian, Bondeson believes murder is a sin.

153.    Bondeson's understanding is that the manufacturers of the COVID-19 vaccine used aborted fetal tissue, the lining of aborted fetal tissue, or both forms of fetal tissue in the development of the COVID-19 vaccines. Some COVID-19 vaccines also use aborted fetal cells in the vaccine itself.

154.    Bondeson sincerely believes taking COVID-19 vaccines that utilize aborted fetal cells would make him a participant in the unjust murder of unborn children. Therefore, Bondeson believes it is a sin to take a COVID-19 vaccine that uses or was developed using aborted fetal cells. Bondeson believes to take such a vaccine would be a sin. As a Christian, Bondeson believes willfully committing a sin is an afront to God that has both temporal and eternal consequences.

155.   After prayer and reflection, Bondeson was placed under the firm conviction that injecting any available COVID-19 vaccines into his body would violate his Christian faith.

156.   Bondeson provided a detailed religious accommodation request to ULA describing his religious conflict on October 1, 2021.

157.   ULA's accommodation committee denied Bondeson's religious accommodation request, as alleged above, after verifying that he held a sincere religious belief in conflict with receipt of a COVID-19 vaccine.

158.   ULA pretextually refused to offer or otherwise provide these options because of Bondeson's disfavored religious beliefs.

159.   There were multiple no-cost and/or less than de minis cost accommodation options available that ULA could have provided to Bondeson. Specifically, ULA could have required Bondeson to be tested prior to entering facilities or performing any other role ULA determined required in-person contact. At the time of Bondeson's termination, testing was available for free throughout the country. Bondeson also would have willingly paid out of pocket for testing in order to retain his job.

160.   ULA did not address any other low-cost and no-cost alternative reasonable accommodations available, including but not limited to: recognition of natural immunity, enhanced safety protocols, continued telework, or any combination of these options.

161.   During the height of the pandemic, from December 2020 (when COVID-19 vaccines became available) through October 2021, Bondeson contributed to the ongoing operation and success of ULA while unvaccinated and while preserving his religious convictions.

162.   ULA provided functional accommodations, consistent with Bondeson's religious convictions, during this period and allowed Bondeson to work unvaccinated while observing

enhanced safety protocols. These safety protocols included a six-foot social distancing policy; mask requirements; sanitizer was made easily available and encouraged; daily temperature checks before entering the facility unless the employee was vaccinated; and a general limitation of two people per company vehicle.

163.    Bondeson would have accepted any reasonable accommodation ULA would have offered as a condition of continued employment.

164.    ULA did not engage in any interactive process calculated towards finding a reasonable accommodation, which the company would have identified had it engaged in an actual good faith accommodation process (which it did not).

165.    ULA placed Bondeson on an involuntary leave of absence on November 1, 2021.

166.    ULA terminated Bondeson because of his sincerely held religious beliefs on December 16, 2021, nine days before Christmas.

167.    When Bondeson was terminated, he possessed natural immunity against COVID-19 through prior infection and recovery.

168.    Bondeson filed a charge of discrimination with the EEOC on November 7, 2021.

169.    As a direct and proximate cause of ULA's discriminatory actions, Bondeson's finances were significantly and negatively impacted.

170.    In addition to financial loss, Bondeson suffered emotional and psychological harm while still employed at ULA from the months of uncertainty and repeated coercion to abandon his sincere religious beliefs in order to preserve his livelihood and career, all related to his unlawful termination. As a result of the discriminatory treatment he experienced, Bondeson suffered from emotional distress which is or has been marked by feelings of despondency, social anxiety, loss of interest in leisure activities, and feelings of agitation, and irritability.

171.    Following his unlawful termination, Bondeson suffered emotional and psychological harm from the months of unemployment and continued coercion by ULA to violate his religious beliefs.

172.    ULA also actively interfered with Bondeson's unemployment claim. In the months leading up to the deadline, ULA made it clear that if Bondeson didn't receive the vaccine, he would be terminated. ULA also made it clear they would file the unemployment as "voluntary resignation" and Bondeson would not be eligible for unemployment benefits. After ULA terminated Bondeson, he applied for unemployment benefits. Bondeson received 14 weeks of unemployment benefits.

173.    On July 14, 2023, Bondeson received a letter from the Alabama Department of Labor notifying him that ULA appealed his claim of benefits and were seeking to reclaim unemployment compensation. On Aug. 28, 2023, Bondeson attended a telephone hearing with ULA and the Alabama Department of Labor. On October 25, 2023, Bondeson received notification from the State of Alabama Department of Labor informing me he was eligible for the benefits he received and would not have to pay it back.

**Zachary Breland**

174.    Plaintiff Zachary Breland ("**Breland**") worked for ULA from 2011 until 2017, when he was laid off from ULA. Breland again worked for ULA from April 2020 until he was terminated in 2021. Breland worked as an Aerospace Production Technician/Welder at ULA's Decatur, Alabama production facility.

175.    Breland performed well in his role, was qualified for his job, and had an exceptional performance record.

176. Breland is a Christian. As a Christian, Breland believes all human beings are made in the image in God. As a Christian, Breland believes life begins at fertilization and ends at natural death. Breland also believes the unjust taking of a human life is murder. As a Christian, Breland believes murder is a sin.

177. Breland's understanding is that the manufacturers of the COVID-19 vaccine used aborted fetal tissue, the lining of aborted fetal tissue, or both forms of fetal tissue in the development of the COVID-19 vaccines. Some COVID-19 vaccines also use aborted fetal cells in the vaccine itself.

178. Breland sincerely believes taking COVID-19 vaccines that utilize aborted fetal cells would make him a participant in the unjust murder of unborn children. Therefore, Breland believes it is a sin to take a vaccine that uses or was developed using aborted fetal cells. Breland believes to take such a vaccine would be a sin. As a Christian, Breland believes willfully committing a sin is an afront to God that has both temporal and eternal consequences.

179. After prayer and reflection, Breland was placed under the firm conviction that injecting any available COVID-19 vaccines into his body would violate his Christian faith.

180. Breland provided a detailed religious accommodation request to ULA describing his religious conflict on September 30, 2021. Breland requested a religious accommodation from ULA's COVID-19 vaccination policy because of his strongly held religious beliefs. Breland also identified regular testing as an accommodation option that would prevent him from taking a COVID-19 vaccine and enable him to maintain his religious integrity.

181. After submitting his accommodation request, Breland met with an HR representative who verified his religious sincerity in conflict with vaccination.

182.    ULA's accommodation committee denied Breland's religious accommodation request, as alleged above.

183.    ULA pretextually refused to offer or otherwise provide these options because of Breland's disfavored religious beliefs and practices.

184.    There were multiple no-cost and/or less than de minis cost accommodation options available that ULA could have provided to Breland. Specifically, ULA could have required Breland to be tested prior to entering facilities or performing any other role ULA determined required in-person contact. At the time of Breland's termination, testing was available for free throughout the country. Breland also would have willingly paid out of pocket for testing in order to retain his job.

185.    ULA did not address any other low-cost and no-cost alternative reasonable accommodations available, including but not limited to: recognition of natural immunity, enhanced safety protocols, continued telework, or any combination of these options.

186.    During the height of the pandemic, from December 2020 (when COVID-19 vaccines became available) through October 2021, Breland contributed to the ongoing operation and success of ULA while unvaccinated and while preserving his religious convictions.

187.    ULA provided functional accommodations, consistent with Breland's religious convictions, during this period and allowed Breland to work unvaccinated while observing enhanced safety protocols. These safety protocols included a six-foot social distancing policy; mask requirements; sanitizer was made easily available and encouraged; daily temperature checks before entering the facility unless the employee was vaccinated; and a general limitation of two people per company vehicle.

188.    Breland would have accepted any reasonable accommodation ULA would have offered as a condition of continued employment.

189.    ULA did not engage in any interactive process calculated towards finding a reasonable accommodation, which the company would have identified had it engaged in an actual accommodation process.

190.    ULA terminated Breland on November 1, 2021, for upholding his religious faith in conflict with the Mandate.

191.    Breland filed a charge of discrimination with the EEOC on November 9, 2021.

192.    As a direct and proximate cause of ULA's discriminatory actions, Breland's finances were significantly and negatively impacted.

193.    In addition to financial loss, Breland suffered emotional and psychological harm while still employed at ULA from the months of uncertainty and repeated coercion to abandon his sincere religious beliefs in order to preserve his livelihood and career, all related to his unlawful termination. As a result of the discriminatory treatment he experienced, Breland suffered from emotional distress which is or has been marked by feelings of despondency, social anxiety, loss of interest in leisure activities, and feelings of agitation, and irritability.

194.    Following his unlawful termination, Breland suffered emotional and psychological harm from the months of unemployment and continued coercion by ULA to violate his religious beliefs.

195.    ULA also actively interfered with Breland's unemployment claim. In the months leading up to the deadline, ULA made it clear that if Breland did not receive the vaccine, he would be terminated. ULA also made it clear they would file the unemployment as "voluntary resignation." Because of this, Breland did not apply for unemployment benefits because he

assumed he would be ineligible if ULA listed filed his case as "voluntary resignation." Breland was also concerned about ULA's hostility towards those who were terminated for religious accommodations.

## Skyler Bunce

194.    Plaintiff Skyler Bunce ("**Bunce**") was employed by ULA for over 3 years. He worked as a Thermodynamics Engineer III – Thermal Analyst.

195.    Throughout his career, Bunce performed well in his role, was qualified for his job, and had an exceptional performance record.

196.    Bunce is an evangelical Christian and has sincere religious beliefs that preclude him from receiving a COVID-19 vaccine. As a Christian, Bunce believes that an individual is morally bound to obey his/her conscience. Bunce believes the conscience to be God given, and is a moral "gut check" by which God guides Christians. Bunce believes following his God-given conscience is incredibly important, especially during life situations where an individual is being pressed to make a quick decision in conflict with his conscience.  Bunce believes undergoing a medical procedure is a major life decision that requires thoughtful prayer and demands observing one's conscience. In Bunce's personal system of religious beliefs, undergoing a major medical procedure—like vaccination—must be voluntary because vaccination is not biblically obligatory (there is no biblical authoritative teaching that requires Christians to receive any vaccine). After thoughtful prayer and reflection, Bunce's conscience was provoked not to receive a vaccine, and to act in conflict with his God-given conscience would be a profound violation of his religious integrity.

197.    Bunce requested a religious accommodation from ULA's COVID-19 vaccination policy because of his strongly held religious beliefs in conflict with receiving a COVID-19 vaccine.

198.    After submitting his accommodation request, Bunce met with an HR representative who verified his religious sincerity in conflict with vaccination.

199.    ULA's accommodation committee denied Bunce's religious accommodation request, as alleged above.

200.    ULA pretextually refused to offer or otherwise provide any accommodation options because of Bunce's disfavored religious beliefs.

201.    There were multiple no-cost and/or less than de minis cost accommodation options available that ULA could have provided to Bunce. Specifically, ULA could have required Bunce to be tested prior to entering facilities or performing any other role ULA determined required in-person contact. At the time of Bunce's termination, testing was available for free throughout the country. Bunce also would have willingly paid out of pocket for testing in order to retain his job.

202.    In addition to the testing accommodation option, there were also multiple other no-cost and/or less than de minis cost accommodation options available that ULA could have provided to Bunce. Bunce was willing to bear any such costs personally in an effort to preserve his career and religious convictions.

203.    ULA did not address several low-cost and no-cost alternative reasonable accommodations available, including but not limited to: recognition of natural immunity, enhanced safety protocols, telework, schedule swapping with vaccinated employees if in-person meetings requiring proof of vaccination were an actual requirement for the job, or any combination of these options.

204.    During the height of the pandemic, from December 2020 (when COVID-19 vaccines became available) through October 2021, Bunce contributed to the ongoing operation and success of ULA while unvaccinated and while preserving his religious convictions.

205.    ULA provided functional accommodations, consistent with Bunce's religious convictions, during this period and allowed Bunce to work unvaccinated while observing enhanced safety protocols. These safety protocols included some combination of six-foot social distancing policy; mask requirements; sanitizer was made easily available and encouraged; daily temperature checks before entering the facility unless the employee was vaccinated; and a general limitation of two people per company vehicle.

206.    Bunce's sincerely held religious beliefs in conflict with vaccination could have been accommodated without any undue burden whatsoever and Bunce would have accepted any of the numerous reasonable accommodation options.

207.    ULA did not engage in any interactive process calculated towards finding a reasonable accommodation, which the company would have identified had it engaged in an actual good faith accommodation process (which it did not).

208.    ULA did not engage in any interactive process calculated towards finding a reasonable accommodation, which the company would have identified had it engaged in an actual accommodation process.

209.    ULA placed Bunce on an involuntary leave of absence on October 30, 2021.

210.    ULA terminated Bunce on November 11, 2021, for upholding his religious beliefs and practices in conflict with the Mandate.

211.    Upon information and belief, after Bunce was terminated, an employee named Julie Chittenden took over Bunce's responsibilities and/or took on opportunities otherwise unavailable

had Bunce not been terminated. Ms. Chittenden did not have religious objections to receipt of a COVID-19 vaccine.

212.    Bunce specifically mentioned to ULA in an email dated October 22, 2021, "I personally don't understand how it is possible to claim undue hardship without any sort of technical input from my manager and a thorough examination of the added value my skill set contributes to the success of this company," to which he never received a direct response.

213.    ULA also actively interfered with Bunce's unemployment claim. In the months leading up to the deadline, ULA made it clear that if Bunce's didn't receive the vaccine, he would be terminated. ULA also made it clear they would file the unemployment as "voluntary resignation" and Bunce would not be eligible for unemployment benefits.

214.    As a direct and proximate cause of ULA's discriminatory actions, Bunce's finances were significantly and negatively impacted.

215.    Bunce filed for unemployment on November 15, 2021. The state of Colorado issued their initial determination on February 2, 2022, stating "Based on information received, our investigation determined that you were separated for reasons that do not result in a disqualification under 8-73-108(5)(e) of the Colorado Employment Security Act."

216.    ULA appealed this decision on February 28, 2022, stating "The claimant voluntarily quit due to dissatisfaction with the employer's COVID-19 vaccine mandate." This triggered an initial appeals hearing on May 2, 2022. The initial hearing was not long enough so a continuance was issued for May 9, 2022. On May 17, 2022, Colorado issued a decision that ruled in Bunce's favor. Unfortunately, this decision came over 6 months after Bunce's separation from ULA, so he was forced to cash out his 401k in early 2022 to make ends meet, which counted as income and disqualified him from unemployment benefits forward of cashout date. ULA challenged, without

reasonable justification, Bunce's unemployment benefits because of his disfavored religious practices. But for ULA's actions in the unemployment process, Bunce would not have cashed out his 401(k).

217.    In addition to financial loss, Bunce suffered emotional and psychological harm while still employed at ULA from the months of uncertainty and repeated coercion to abandon his sincere religious beliefs in order to preserve his livelihood and career, all related to his unlawful termination. As a result of the discriminatory treatment he experienced, Bunce suffered from emotional distress which is or has been marked by some combination of feelings of despondency, social anxiety, loss of interest in leisure activities, and feelings of agitation, and irritability.

218.    Following his unlawful termination, Bunce suffered emotional and psychological harm from the months of unemployment and continued coercion by ULA to violate his religious beliefs.

### Christopher Byrd

219.    Plaintiff Christopher O. Byrd ("**Byrd**") was employed by ULA from January 28, 2002, until he was terminated on January 10, 2022. Byrd worked as a Production Planner – Schedule Control Specialist at ULA's Decatur, Alabama production facility. He also served as a Person-in-Charge ("PIC") responsible for the logistics of moving completed rocket stages from the Decatur facility to its transportation point of departure.

220.    Byrd performed well in his role, was qualified for his job, and had an exceptional performance record.

221.    Byrd is a Christian. As a Christian, Byrd believes all human beings are made in the image in God. As a Christian, Byrd believes life begins at fertilization and ends at natural death. Byrd also believes the unjust taking of a human life is murder. As a Christian, Byrd believes murder is a sin.

222.    Byrd's understanding is that the manufacturers of the COVID-19 vaccine used aborted fetal tissue, the lining of aborted fetal tissue, or both forms of fetal tissue in the development of the COVID-19 vaccines. Some COVID-19 vaccines also use aborted fetal cells in the vaccine itself.

223.    Byrd sincerely believes taking COVID-19 vaccines that utilize aborted fetal cells would make him a participant in the unjust murder of unborn children. Therefore, Byrd believes it is a sin to take a vaccine that uses or was developed using aborted fetal cells. Byrd believes to take such a vaccine would be a sin. As a Christian, Byrd believes willfully committing a sin is an afront to God that has both temporal and eternal consequences.

224.    After prayer and reflection, Byrd was placed under the firm conviction that injecting any available COVID-19 vaccines into his body would violate his Christian faith.

225.    On September 29, 2021, Byrd requested a religious accommodation from ULA's COVID-19 vaccination policy because of his strongly held religious beliefs. Byrd met with his HR representative to discuss his sincerely held religious beliefs.

226.    ULA's accommodation committee denied Byrd's religious accommodation request, as alleged above, after verifying that he held a sincere religious belief in conflict with receipt of a COVID-19 vaccine.

227.    ULA pretextually refused to offer or otherwise provide these options because of Byrd's disfavored religious beliefs.

228.    There were multiple no-cost and/or less than de minis cost accommodation options available that ULA could have provided to Byrd. Specifically, ULA could have required Byrd to be tested prior to entering facilities or performing any other role ULA determined required in-

person contact. At the time of Byrd's termination, testing was available for free throughout the country. Byrd also would have willingly paid out of pocket for testing in order to retain his job.

229.    ULA did not address any other low-cost and no-cost alternative reasonable accommodations available, including but not limited to: recognition of natural immunity, enhanced safety protocols, continued telework, or any combination of these options.

230.    During the height of the pandemic, from December 2020 (when COVID-19 vaccines became available) through October 2021, Byrd contributed to the ongoing operation and success of ULA while unvaccinated and while preserving his religious convictions.

231.    ULA provided functional accommodations, consistent with Byrd's religious convictions, during this period and allowed Byrd to work unvaccinated while observing enhanced safety protocols. These safety protocols included a six-foot social distancing policy; mask requirements; sanitizer was made easily available and encouraged; daily temperature checks before entering the facility unless the employee was vaccinated; and a general limitation of two people per company vehicle.

232.    Byrd would have accepted any reasonable accommodation ULA would have offered as a condition of continued employment.

233.    Byrd appealed the denial of his religious accommodation request. ULA denied Byrd's accommodation request and notified Byrd of their decision on December 7, 2021.

234.    ULA did not engage in any interactive process calculated towards finding a reasonable accommodation, which the company would have identified had it engaged in a good faith accommodation process. ULA terminated Byrd because of his religious beliefs on January 10, 2022.

235.    ULA terminated Byrd because of his religious beliefs on January 10, 2022.

236.    When Byrd was terminated, he possessed natural immunity against COVID-19 through prior infection and recovery.

237.    Byrd filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), on March 3, 2022.

238.    As a direct and proximate cause of ULA's discriminatory actions, Byrd's finances were significantly and negatively impacted.

239.    In addition to financial loss, Byrd suffered emotional and psychological harm while still employed at ULA from the months of uncertainty and repeated coercion to abandon his sincere religious beliefs in order to preserve his livelihood and career, all related to his unlawful termination. As a result of the discriminatory treatment he experienced, Byrd suffered from emotional distress which is or has been marked by feelings of despondency, social anxiety, loss of interest in leisure activities, and feelings of agitation, and irritability.

240.    Following his unlawful termination, Byrd suffered emotional and psychological harm from the months of unemployment and continued coercion by ULA to violate his religious beliefs.

241.    ULA also actively interfered with Byrd's unemployment claim. In the months leading up to the deadline, ULA made it clear that if Byrd did not receive the vaccine, he would be terminated. ULA also made it clear they would file the unemployment as "voluntary resignation" and Byrd would not be eligible for unemployment benefits. After ULA terminated Byrd, he applied for unemployment benefits. Byrd received 14 weeks of unemployment benefits.

242.    ULA appealed Byrd's unemployment benefits claiming that Byrd was discharged for a violation of company rule or policy. Byrd attended a telephonic hearing, at which ULA failed to appear. The Alabama Unemployment Department subsequently dismissed ULA's appeal.

**Benjamin Eastman**

243.    Plaintiff Benjamin Eastman ("**Eastman**") was employed by ULA for over three years. Eastman worked as a Mechanical Tool Design Engineer at ULA's Decatur, Alabama facility.

244.    Eastman performed well in his role, was qualified for his job, and had an exceptional performance record. In fact, three months prior to termination, Eastman received a promotion to Engineer II based on his job performance.

245.    Eastman is a Christian. As a Christian, Eastman believes all human beings are made in the image in God. As a Christian, Eastman believes life begins at fertilization and ends at natural death. Eastman also believes the unjust taking of a human life is murder. As a Christian, Eastman believes murder is a sin.

246.    Eastman's understanding is that the manufacturers of the COVID-19 vaccine used aborted fetal tissue, the lining of aborted fetal tissue, or both forms of fetal tissue in the development of the COVID-19 vaccines. Some COVID-19 vaccines also use aborted fetal cells in the vaccine itself.

247.    Eastman sincerely believes taking COVID-19 vaccines that utilize aborted fetal cells would make him a participant in the unjust murder of unborn children. Therefore, Eastman believes it is a sin to take a vaccine that uses or was developed using aborted fetal cells. Eastman believes to take such a vaccine would be a sin. As a Christian, Eastman believes willfully committing a sin is an afront to God that has both temporal and eternal consequences.

248.    After prayer and reflection, Eastman was placed under the firm conviction that injecting any available COVID-19 vaccines into his body would violate his Christian faith.

249.    Eastman provided a detailed religious accommodation request to ULA describing his religious conflict on September 21, 2021.

250.    After submitting his accommodation request, Eastman met with an HR representative who verified his religious sincerity. Eastman's manager was not present for this meeting.

251.    ULA's accommodation committee denied Eastman's religious accommodation request, as alleged above.

252.    ULA pretextually refused to offer or otherwise provide these options because of Eastman's disfavored religious beliefs.

253.    There were multiple no-cost and/or less than de minis cost accommodation options available that ULA could have provided to Eastman. Specifically, ULA could have required Eastman to be tested prior to entering facilities or performing any other role ULA determined required in-person contact. At the time of Eastman's termination, testing was available for free throughout the country. Eastman also would have willingly paid out of pocket for testing in order to retain his job.

254.    ULA did not address any other low-cost and no-cost alternative reasonable accommodations available, including but not limited to: recognition of natural immunity, enhanced safety protocols, continued telework, voluntary schedule swapping, or any combination of these options.

255.    During the height of the pandemic, from December 2020 (when COVID-19 vaccines became available) through October 2021, Eastman contributed to the ongoing operation and success of ULA while unvaccinated and while preserving his religious convictions. During this time, Eastman worked remotely for a significant amount of time.

256.    ULA provided functional accommodations, consistent with Eastman's religious convictions, during this period and allowed Eastman to work unvaccinated while observing enhanced safety protocols. These safety protocols included a six-foot social distancing policy;

mask requirements; sanitizer was made easily available and encouraged; daily temperature checks before entering the facility unless the employee was vaccinated; and a general limitation of two people per company vehicle.

257.    Eastman would have accepted any reasonable accommodation ULA would have offered as a condition of continued employment.

258.    ULA did not engage in any interactive process calculated towards finding a reasonable accommodation, which the company would have identified had it engaged in a good faith accommodation process.

259.    ULA terminated Eastman on November 11, 2021, for upholding his religious faith in conflict with the Mandate.

260.    Eastman filed a charge of discrimination with the EEOC on February 22, 2022.

261.    As a direct and proximate cause of ULA's discriminatory actions, Eastman's finances were significantly and negatively impacted.

262.    In addition to financial loss, Eastman suffered emotional and psychological harm while still employed at ULA from the months of uncertainty and repeated coercion to abandon his sincere religious beliefs in order to preserve his livelihood and career, all related to his unlawful termination. As a result of the discriminatory treatment he experienced, Eastman suffered from emotional distress which is or has been marked by feelings of despondency, social anxiety, loss of interest in leisure activities, and feelings of agitation, and irritability.

263.    Following his unlawful termination, Eastman suffered financial, emotional, and psychological harm from the months of unemployment and continued coercion by ULA to violate his religious beliefs. Importantly, Eastman and his wife were expecting their first child when he was terminated.

264.    ULA also actively interfered with Eastman's unemployment claim. In the months leading up to the deadline, ULA made it clear that if Eastman didn't receive the vaccine, he would be terminated. ULA also made it clear they would file the unemployment as "voluntary resignation" and Eastman would not be eligible for unemployment benefits.

265.    After ULA terminated Eastman, he applied for unemployment benefits. However, he did not receive any unemployment pay until October 18, 2023.

### Cory Kannegieter

266.    Plaintiff Cory Kannegieter ("**Kannegieter**") worked for ULA for over 11 years. Kannegieter was employed at ULA as a Program Planning and Control Leader L4.

267.    Throughout his career, Kannegieter performed well in his role, was qualified for his job, and had an exceptional performance record.

268.    Kannegieter is a Christian. As a Christian, Kannegieter believes all human beings are made in the image in God. As a Christian, Kannegieter believes life begins at fertilization and ends at natural death. Kannegieter also believes the unjust taking of a human life is murder. As a Christian, Kannegieter believes murder is a sin.

269.    Kannegieter's understanding is that the manufacturers of the COVID-19 vaccine used aborted fetal tissue, the lining of aborted fetal tissue, or both forms of fetal tissue in the development of the COVID-19 vaccines. Some COVID-19 vaccines also use aborted fetal cells in the vaccine itself.

270.    Kannegieter sincerely believes taking COVID-19 vaccines that utilize aborted fetal cells would make him a participant in the unjust murder of unborn children. Therefore, Kannegieter believes it is a sin to take a vaccine that uses or was developed using aborted fetal cells. Kannegieter believes to take such a vaccine would be a sin. As a Christian, Kannegieter

believes willfully committing a sin is an afront to God that has both temporal and eternal consequences.

271.    After prayer and reflection, Kannegieter was placed under the firm conviction that injecting any available COVID-19 vaccines into his body would violate his Christian faith.

272.    Kannegieter requested a religious accommodation from ULA's COVID-19 vaccination policy because of his strongly held religious beliefs in conflict with receiving a COVID-19 vaccine.

273.    After submitting his accommodation request, Kannegieter met with an HR representative who verified his religious sincerity in conflict with vaccination.

274.    ULA's accommodation committee denied Kannegieter's religious accommodation request, as alleged above.

275.    ULA pretextually refused to offer or otherwise provide any accommodation options because of Kannegieter's disfavored religious beliefs.

276.    There were multiple no-cost and/or less than de minis cost accommodation options available that ULA could have provided to Kannegieter. Specifically, ULA could have required Kannegieter to be tested prior to entering facilities or performing any other role ULA determined required in-person contact. At the time of Kannegieter's termination, testing was available for free throughout the country. Kannegieter also would have willingly paid out of pocket for testing in order to retain his job.

277.    In addition to the testing accommodation option, there were also multiple other no-cost and/or less than de minis cost accommodation options available that ULA could have provided to Kannegieter. Kannegieter was willing to bear any such costs personally in an effort to preserve his career and religious convictions.

278.    ULA did not address several low-cost and no-cost alternative reasonable accommodations available, including but not limited to: recognition of natural immunity, enhanced safety protocols, telework, schedule swapping with vaccinated employees if in-person meetings requiring proof of vaccination were an actual requirement for the job, or any combination of these options.

279.    During the height of the pandemic, from December 2020 (when COVID-19 vaccines became available) through October 2021, Kannegieter contributed to the ongoing operation and success of ULA while unvaccinated and while preserving his religious convictions.

280.    ULA provided functional accommodations, consistent with Kannegieter's religious convictions, during this period and allowed Kannegieter to work unvaccinated while observing enhanced safety protocols. These safety protocols included some combination of six-foot social distancing policy; mask requirements; sanitizer was made easily available and encouraged; daily temperature checks before entering the facility unless the employee was vaccinated; and a general limitation of two people per company vehicle.

281.    Kannegieter would have accepted any reasonable accommodation ULA would have offered, including but not limited to: recognizing his natural immunity as an accommodation option, regular testing (which was available for free where he lived and throughout the country during the relevant timeframes), enhanced safety protocols (such as masking and social distancing), telework, schedule swapping with vaccinated employees if in-person meetings requiring proof of vaccination were ever an actual requirement for performing his job, providing proof of a negative COVID-19 test before in-person meetings, or any combination of these options.

282.    Kannegieter's sincerely held religious beliefs in conflict with vaccination could have been accommodated without any undue burden whatsoever and Kannegieter would have accepted any of the numerous reasonable accommodation options.

283.    ULA did not engage in any interactive process calculated towards finding a reasonable accommodation, which the company would have identified had it engaged in an good faith accommodation process.

284.    ULA placed Kannegieter on an involuntary leave of absence on October 29, 2021.

285.    ULA terminated Kannegieter on November 5, 2021, for upholding his religious beliefs and practices in conflict with the Mandate.

286.    As a direct and proximate cause of ULA's discriminatory actions, Kannegieter's finances were significantly and negatively impacted.

287.    In addition to financial loss, Kannegieter suffered emotional and psychological harm while still employed at ULA from the months of uncertainty and repeated coercion to abandon his sincere religious beliefs in order to preserve his livelihood and career, all related to his unlawful termination. As a result of the discriminatory treatment he experienced, Kannegieter suffered from emotional distress which is or has been marked by some combination of feelings of despondency, social anxiety, loss of interest in leisure activities, and feelings of agitation, and irritability.

288.    Following his unlawful termination, Kannegieter suffered emotional and psychological harm from the months of unemployment.

**Shawn Laabs**

289.    Plaintiff Shawn Laabs ("**Laabs**") worked for ULA for over 11 years. Laabs was employed at ULA as a Senior Leader of System Safety and Quality Engineering.

290.   Throughout his career, Laabs performed well in his role, was qualified for his job, and had an exceptional performance record.

291.   Laabs is a Christian and has sincere religious beliefs that preclude him from receiving a COVID-19 vaccine. Specifically, Laabs believes the COVID-19 vaccines are a prelude to the "Mark of the Beast." Laabs quoted Revelation 13:10 in his religious accommodation request, which states, "If anyone is to go into captivity, into captivity they will go. If anyone is to be killed with the sword, with the sword they will be killed. This calls for patient endurance and faithfulness on the part of God's people." This warning is near Revelation 13:16-18, the verse understood to discuss the "Mark of the Beast," which Laabs interprets as an explicit warning from God to the believer, to be cautious and obedient when God leads him to believe a situation potentially spoken about in Revelations arises. In Laabs' personal system of religious beliefs, if he does not heed God's warnings, he would be subject to judgment and could lose God's blessings. Laabs has other religious objections to receipt of a COVID-19 vaccine, this was the most pressing and appropriate religious objection, so was the one he outlined to ULA.

292.   Laabs requested a religious accommodation from ULA's COVID-19 vaccination policy because of his strongly held religious beliefs in conflict with the Mandate.

293.   After submitting his accommodation request, Laabs met with an HR representative who verified his religious sincerity in conflict with vaccination.

294.   ULA's accommodation committee denied Laabs' religious accommodation request, as alleged above.

295.   ULA pretextually refused to offer or otherwise provide any accommodation options because of Laabs' disfavored religious beliefs and practices.

296.    There were multiple no-cost and/or less than de minis cost accommodation options available that ULA could have provided to Laabs. Specifically, ULA could have required Laabs to be tested prior to entering facilities or performing any other role ULA determined required in-person contact. At the time of Laabs' termination, testing was available for free throughout the country. Laabs also would have willingly paid out of pocket for testing in order to retain his job.

297.    In addition to the testing accommodation option, there were also multiple no-cost and/or less than de minis cost accommodation options available that ULA could have provided to Laabs.

298.    ULA did not address several low-cost and no-cost reasonable accommodations available, including but not limited to: recognition of natural immunity, enhanced safety protocols, telework, schedule swapping with vaccinated employees if in-person meetings requiring proof of vaccination were an actual requirement for the job, or any combination of these options.

299.    During the height of the pandemic, from December 2020 (when COVID-19 vaccines became available) through October 2021, Laabs contributed to the ongoing operation and success of ULA while unvaccinated and while preserving his religious convictions.

300.    ULA provided functional accommodations, consistent with Laabs's religious convictions, during this period and allowed Laabs to work unvaccinated while observing enhanced safety protocols. These safety protocols included some combination of six-foot social distancing policy; mask requirements; sanitizer was made easily available and encouraged; daily temperature checks before entering the facility unless the employee was vaccinated; and a general limitation of two people per company vehicle.

301.    Laabs' sincerely held religious beliefs in conflict with vaccination could have been accommodated without any undue burden whatsoever and Laabs would have accepted any of the numerous reasonable accommodation options.

302.    ULA did not engage in any interactive process calculated towards finding a reasonable accommodation, which the company would have identified had it engaged in a good faith accommodation process.

303.    Laabs was part of leadership discussion where COVID-19 metrics were displayed and discussed. There was a large surge in COVID-19 positive results before and after the Delta variant wave (from approximately July of 2021 through December of 2021), and that increase in cases was largely attributed to vaccinated employees.

304.    ULA placed Laabs on an involuntary leave of absence on October 29, 2021.

305.    ULA terminated Laabs on November 2, 2021, for upholding his religious beliefs and practices in conflict with the Mandate.

306.    When Laabs was terminated, Jack Norray assumed his job duties, although his position was not formally replaced. Mr. Norray did not have religious objections to receipt of a COVID-19 vaccine.

307.    As a direct and proximate cause of ULA's discriminatory actions, Laabs's finances were significantly and negatively impacted.

308.    In addition to financial loss, Laabs suffered emotional and psychological harm while still employed at ULA from the months of uncertainty and repeated coercion to abandon his sincere religious beliefs in order to preserve his livelihood and career, all related to his unlawful termination. As a result of the discriminatory treatment he experienced, Laabs suffered from

emotional distress which is or has been marked by some combination of feelings of despondency, social anxiety, loss of interest in leisure activities, feelings of agitation, irritability, and depression.

309.     Following his unlawful termination, Laabs suffered emotional and psychological harm from the months of uncertainty and unemployment. As a result of the discriminatory treatment he experienced, Laabs suffered from emotional distress which is or has been marked by some combination of feelings of despondency, social anxiety, loss of interest in leisure activities, feelings of agitation, irritability, and depression.

**Richard Mack**

310.     Plaintiff Richard Mack ("**Mack**") worked for ULA for over 3 years. Mack was employed at ULA as a Dynamic Environments Engineer.

311.     Throughout his career, Mack performed well in his role, was qualified for his job, and had an exceptional performance record.

312.     Mack is a Christian. As a Christian, Mack believes all human beings are made in the image in God. As a Christian, Mack believes life on earth begins at fertilization and ends at death. Mack also believes the unjust taking of a human life is murder. As a Christian, Mack believes murder is a sin.

313.     Mack's understanding is that the manufacturers of the COVID-19 vaccine used aborted fetal cell lines in the development of the COVID-19 vaccines. Some COVID-19 vaccines also use aborted fetal cells or cell lines in the vaccine itself.

314.     Mack sincerely believes taking a COVID-19 vaccine that utilizes aborted fetal cell lines would make him a participant in the unjust murder of unborn children. Therefore, Mack believes it is a sin to take any COVID-19 vaccine that uses or was developed using aborted fetal cells. Mack

believes to take such a vaccine would be a sin. As a Christian, Mack believes willfully committing

a sin is an afront to God that has both temporal and eternal consequences.

315.    Separately and distinctly, he believes that his body is a living temple where the Spirit

of God resides and indwells. The introduction of COVID-19 vaccines to his body is not prudent

stewardship of his body, and would be a sin in his religious system of beliefs.

316.    Separately and distinctly, he believes that God blessed him with a well-created and

functioning immune system and he cannot preemptively alter his immune system, which would

exhibit a lack of faith and be a sin in his religious system of beliefs.

317.    After prayer and reflection, Mack was placed under the firm conviction that injecting

any available COVID-19 vaccines into his body would violate his Christian faith.

318.    Mack requested a religious accommodation from ULA's COVID-19 vaccination policy

because of his strongly held religious beliefs in conflict with receiving a COVID-19 vaccine.

319.    After submitting his accommodation request, Mack met with an HR representative who

verified his religious sincerity in conflict with vaccination.

320.    ULA's accommodation committee denied Mack's religious accommodation request,

as alleged above.

321.    ULA pretextually refused to offer or otherwise provide any accommodation options

because of Mack's disfavored religious beliefs.

322.    There were multiple no-cost and/or less than de minis cost accommodation options

available that ULA could have provided to Mack. Specifically, ULA could have required Mack to

be tested prior to entering facilities or performing any other role ULA determined required in-

person contact. At the time of Mack's termination, testing was available for free throughout the

country. Mack also would have willingly paid out of pocket for testing in order to retain his job.

323.     In addition to the testing accommodation option, there were also multiple other no-cost and/or less than de minis cost accommodation options available that ULA could have provided to Mack. Mack was willing to bear any such costs personally in an effort to preserve his career and religious convictions.

324.     ULA did not address several low-cost and no-cost alternative reasonable accommodations available, including but not limited to: recognition of natural immunity, enhanced safety protocols, telework, schedule swapping with vaccinated employees if in-person meetings requiring proof of vaccination were an actual requirement for the job, or any combination of these options.

325.     During the height of the pandemic, from December 2020 (when COVID-19 vaccines became available) through October 2021, Mack contributed to the ongoing operation and success of ULA while unvaccinated and while preserving his religious convictions.

326.     ULA provided functional accommodations, consistent with Mack's religious convictions, during this period and allowed Mack to work unvaccinated while observing enhanced safety protocols. These safety protocols included some combination of six-foot social distancing policy; mask requirements; sanitizer was made easily available and encouraged; daily temperature checks before entering the facility unless the employee was vaccinated; and a general limitation of two people per company vehicle.

327.     Mack's sincerely held religious beliefs in conflict with vaccination could have been accommodated without any undue burden whatsoever and Mack would have accepted any of the numerous reasonable accommodation options.

328.    ULA did not engage in any interactive process calculated towards finding a reasonable accommodation, which the company would have identified had it engaged in a good faith accommodation process.

329.    ULA placed Mack on an involuntary leave of absence on October 29, 2021.

330.    ULA terminated Mack on November 19, 2021, for upholding his religious beliefs and practices in conflict with the Mandate.

331.    On the date scheduled for his exit interview, Mack advised Janet Williams that he was positive for COVID-19. Instead of rescheduling the interview, Williams held the interview outdoors, on company property, less than six feet apart, and without the use of any other enhanced safety protocols. This is further indication that ULA was using pretext for terminating employees with religious conviction against the vaccination mandate. In short, the company was not concerned about workplace safety, but rather about purging the maximum number of employees with religious practices in conflict with vaccination.

332.    As a direct and proximate cause of ULA's discriminatory actions, Mack's finances were significantly and negatively impacted.

333.    In addition to financial loss, Mack suffered emotional and psychological harm while still employed at ULA from the months of uncertainty and repeated coercion to abandon his sincere religious beliefs in order to preserve his livelihood and career, all related to his unlawful termination. As a result of the discriminatory treatment he experienced, Mack suffered from emotional distress which is or has been marked by some combination of feelings of despondency, social anxiety, loss of interest in leisure activities, and feelings of agitation, and irritability.

334.    Following his unlawful termination, Mack suffered emotional and psychological harm from the months of unemployment and continued retaliation and harassment by ULA.

335.     ULA challenged Mack's unemployment benefits every step of the way alleging that he voluntarily resigned or violated company policy. An unemployment insurance appeal hearing was conducted on April 21, 2021, and ULA did not attend. On April 29, 2022, a decision was released advising that Mack was eligible for unemployment benefits. ULA appealed this decision. On June 17, 2022, the lower decision was affirmed by the Insurance Claims Appeals Office.

### Sherrie Maine

336.     Plaintiff Sherrie Maine ("**Maine**") employed by ULA for over 14 years. Maine worked as a Quality Inspector at ULA's Decatur, Alabama site.

337.     Maine performed well in her role, was qualified for her job, and had an exceptional performance record.

338.     Maine is a Christian. As a Christian, Maine believes all human beings are made in the image in God. As a Christian, Maine believes life begins at fertilization and ends at natural death. Maine also believes the unjust taking of a human life is murder. As a Christian, Maine believes murder is a sin.

339.     Maine's understanding is that the manufacturers of the COVID-19 vaccine used aborted fetal tissue, the lining of aborted fetal tissue, or both forms of fetal tissue in the development of the COVID-19 vaccines. Some COVID-19 vaccines also use aborted fetal cells in the vaccine itself.

340.     Maine sincerely believes taking COVID-19 vaccines that utilize aborted fetal cells would make her a participant in the unjust murder of unborn children. Therefore, Maine believes it is a sin to take a COVID-19 vaccine that uses or was developed using aborted fetal cells. Maine believes to take such a vaccine would be a sin. As a Christian, Maine believes willfully committing a sin is an afront to God that has both temporal and eternal consequences.

341.   After prayer and reflection, Maine was placed under the firm conviction that injecting any available COVID-19 vaccines into her body would violate her Christian faith.

342.   Maine provided a detailed religious accommodation request to ULA describing her religious conflict on October 27, 2021. ULA had clear notice of her religious conflict with the Mandate and need for religious accommodation.  The company never questioned the religious sincerity of her conflict with vaccination, and in subsequent proceedings, verified that it had validated that all members of the Religious Class had presented religious objections to vaccination that triggered the company's Title VII duty to accommodate short of undue hardship.

343.   ULA pretextually refused to offer or otherwise provide these options because of Maine's disfavored religious beliefs.

344.   There were multiple no-cost and/or less than de minis cost accommodation options available that ULA could have provided to Maine. Specifically, ULA could have required Maine to be tested prior to entering facilities or performing any other role ULA determined required in-person contact. At the time of Maine's termination, testing was available for free throughout the country. Maine also would have willingly paid out of pocket for testing in order to retain her job.

345.   ULA did not address any other low-cost and no-cost alternative reasonable accommodations available, including but not limited to: recognition of natural immunity, enhanced safety protocols, continued telework, or any combination of these options.

346.   During the height of the pandemic, from December 2020 (when COVID-19 vaccines became available) through October 2021, Maine contributed to the ongoing operation and success of ULA while unvaccinated and while preserving her religious convictions.

347.   ULA provided functional accommodations, consistent with Maine's religious convictions, during this period and allowed Maine to work unvaccinated while observing enhanced

safety protocols. These safety protocols included a six-foot social distancing policy; mask requirements; sanitizer was made easily available and encouraged; daily temperature checks before entering the facility unless the employee was vaccinated; and a general limitation of two people per company vehicle.

348.    Maine would have accepted any reasonable accommodation ULA would have offered as a condition of continued employment.

349.    ULA did not engage in any interactive process calculated towards finding a reasonable accommodation, which the company would have identified had it engaged in a good faith accommodation process.

350.    ULA placed Maine on an involuntary leave of absence on October 29, 2021.

351.    ULA terminated Maine on December 22, 2021, three days before Christmas, for upholding her religious faith in conflict with the Mandate.

352.    When Maine was terminated, she possessed natural immunity against COVID-19 through prior infection and recovery.

353.    Maine filed a charge of discrimination with the EEOC on January 22, 2021.

354.    As a direct and proximate cause of ULA's discriminatory actions, Maine's finances were significantly and negatively impacted.

355.    In addition to financial loss, Maine suffered emotional and psychological harm while still employed at ULA from the months of uncertainty and repeated coercion to abandon her sincere religious beliefs in order to preserve her livelihood and career, all related to her unlawful termination. As a result of the discriminatory treatment she experienced, Maine suffered from emotional distress which is or has been marked by feelings of despondency, social anxiety, loss of interest in leisure activities, and feelings of agitation, and irritability.

356.    Following her unlawful termination, Maine suffered emotional and psychological harm from the months of unemployment and continued coercion by ULA to violate his religious beliefs. Maine also faced significant difficulties finding another job in the same sector because of her age. Ultimately, Maine was forced into early retirement despite planning to work for several more years.

357.    ULA also actively interfered with Maine's unemployment claim. In the months leading up to the deadline, ULA made it clear that if Maine didn't receive the vaccine, she would be terminated. ULA also made it clear they would file the unemployment as "voluntary resignation" and Maine would not be eligible for unemployment benefits. After ULA terminated Maine, she applied for unemployment benefits. Maine received one lump sum of unemployment benefits.

358.    In July 2023, Maine received a letter from the Alabama Department of Labor notifying her that ULA appealed her claim of benefits and were seeking to reclaim unemployment compensation. On February 2, 2024, Maine attended a telephone hearing at which ULA failed to appear. The Alabama Unemployment Department subsequently dismissed ULA's appeal.

**Ricky Mason**

359.    Plaintiff Ricky Mason ("**Mason**") was employed by ULA for over 10 years. Mason worked as an Aerospace Technician at ULA's Decatur, Alabama production facility.

360.    Mason performed well in his role, was qualified for his job, and had an exceptional performance record.

361.    Mason is a Muslim and has sincere religious beliefs that prevented his from receiving COVID-19 or any other vaccines. Immunization, particularly of experimental vaccines, goes against Mason's sincerely held religious beliefs. Since converting to the Nation of Islam, Mason has not received any vaccination. In support of his religious accommodation request, Mason

submitted a letter from his minister explaining that vaccination and immunization are contrary to how he interprets the beliefs of the Nation of Islam.

362.    On September 14, 2021, Mason requested a religious accommodation from ULA's COVID-19 vaccination policy because of his strongly held religious beliefs.

363.    After submitting his accommodation request, Mason met with an HR representative who verified his religious sincerity.

364.    ULA's accommodation committee denied Mason's religious accommodation request, as alleged above.

365.    ULA pretextually refused to offer or otherwise provide these options because of Mason's disfavored religious beliefs.

366.    There were multiple no-cost and/or less than de minis cost accommodation options available that ULA could have provided to Mason. Specifically, ULA could have required Mason to be tested prior to entering facilities or performing any other role ULA determined required in-person contact. At the time of Mason's termination, testing was available for free throughout the country. Mason also would have willingly paid out of pocket for testing in order to retain his job.

367.    ULA did not address any other low-cost and no-cost alternative reasonable accommodations available, including but not limited to: recognition of natural immunity, enhanced safety protocols, continued telework, voluntary schedule swapping, or any combination of these options.

368.    During the height of the pandemic, from December 2020 (when COVID-19 vaccines became available) through October 2021, Mason contributed to the ongoing operation and success of ULA while unvaccinated and while preserving his religious convictions.

369.    ULA provided functional accommodations, consistent with Mason's religious convictions, during this period and allowed Mason to work unvaccinated while observing enhanced safety protocols. These safety protocols included a six-foot social distancing policy; mask requirements; sanitizer was made easily available and encouraged; daily temperature checks before entering the facility unless the employee was vaccinated; and a general limitation of two people per company vehicle.

370.    Mason would have accepted any reasonable accommodation ULA would have offered as a condition of continued employment. Importantly, Mason volunteered to pay the additional costs out of pocket if he could keep his job. However, ULA terminated him anyway.

371.    ULA did not engage in any interactive process calculated towards finding a reasonable accommodation, which the company would have identified had it engaged in a good faith accommodation process.

372.    ULA placed Mason on involuntary leave on October 21, 2021.

373.    ULA terminated Mason on December 9, 2021, for upholding his religious faith in conflict with the Mandate.

374.    Mason filed a charge of discrimination with the EEOC on or about February 4, 2022.

375.    As a direct and proximate cause of ULA's discriminatory actions, Mason's finances were significantly and negatively impacted. This included being forced to sell his home and move because he could no longer afford his mortgage payments.

376.    In addition to financial loss, Mason suffered emotional and psychological harm while still employed at ULA from the months of uncertainty and repeated coercion to abandon his sincere religious beliefs in order to preserve his livelihood and career, all related to his unlawful termination. As a result of the discriminatory treatment he experienced, Mason suffered from

emotional distress which is or has been marked by feelings of despondency, social anxiety, loss of interest in leisure activities, and feelings of agitation, and irritability.

377.    Following his unlawful termination, Mason suffered emotional and psychological harm from the months of unemployment and continued coercion by ULA to violate his religious beliefs.

378.    ULA also actively interfered with Mason's unemployment claim. In the months leading up to the deadline, ULA made it clear that if Mason didn't receive the vaccine, he would be terminated. ULA also made it clear they would file the unemployment as "voluntary resignation" and Mason would not be eligible for unemployment benefits. Mason filed for unemployment and was able to receive six months of unemployment benefits.

**Jaime McCormick**

379.    Plaintiff Jaime McCormick ("**McCormick**") was employed by ULA for over 15 years. McCormick worked as a Weld Technician at ULA's Decatur, Alabama production facility.

380.    McCormick performed well in his role, was qualified for his job, and had an exceptional performance record.

381.    McCormick is a Christian. As a Christian, McCormick believes all human beings are made in the image in God. As a Christian, McCormick believes life begins at fertilization and ends at natural death. McCormick also believes the unjust taking of a human life is murder. As a Christian, McCormick believes murder is a sin.

382.    McCormick's understanding is that the manufacturers of the COVID-19 vaccine used aborted fetal tissue, the lining of aborted fetal tissue, or both forms of fetal tissue in the development of the COVID-19 vaccines. Some COVID-19 vaccines also use aborted fetal cells in the vaccine itself.

383.    McCormick sincerely believes taking COVID-19 vaccines that utilizes aborted fetal cells would make him a participant in the unjust murder of unborn children. Therefore, McCormick believes it is a sin to take a vaccine that uses or was developed using aborted fetal cells. McCormick believes to take such a vaccine would be a sin. As a Christian, McCormick believes willfully committing a sin is an afront to God that has both temporal and eternal consequences.

384.    After prayer and reflection, McCormick was placed under the firm conviction that injecting any available COVID-19 vaccines into his body would violate his Christian faith.

385.    McCormick provided a detailed religious accommodation request to ULA describing his religious conflict on September 28, 2021.

386.    After submitting his accommodation request, McCormick met with an HR representative who verified his religious sincerity.

387.    ULA's accommodation committee denied McCormick's religious accommodation request, as alleged above.

388.    ULA pretextually refused to offer or otherwise provide these options because of McCormick's disfavored religious beliefs.

389.    There were multiple no-cost and/or less than de minis cost accommodation options available that ULA could have provided to McCormick. Specifically, ULA could have required McCormick to be tested prior to entering facilities performing job roles ULA determined. At the time of McCormick's termination, testing was available for free throughout the country. McCormick also would have willingly paid out of pocket for testing in order to retain his job.

390.    ULA did not address any other low-cost and no-cost alternative reasonable accommodations available, including but not limited to: recognition of natural immunity, enhanced safety protocols, continued telework, or any combination of these options.

391.    During the height of the pandemic, from December 2020 (when COVID-19 vaccines became available) through October 2021, McCormick contributed to the ongoing operation and success of ULA while unvaccinated and while preserving his religious convictions.

392.    ULA provided functional accommodations, consistent with McCormick's religious convictions, during this period and allowed McCormick to work unvaccinated while observing enhanced safety protocols. These safety protocols included a six-foot social distancing policy; mask requirements; sanitizer was made easily available and encouraged; daily temperature checks before entering the facility unless the employee was vaccinated; and a general limitation of two people per company vehicle.

393.    McCormick would have accepted any reasonable accommodation ULA would have offered as a condition of continued employment.

394.    ULA did not engage in any interactive process calculated towards finding a reasonable accommodation, which the company would have identified had it engaged in a good faith accommodation process.

395.    ULA placed McCormick on an involuntary leave of absence on October 29, 2021.

396.    ULA terminated McCormick because of his sincerely held religious beliefs on December 16, 2021, a mere nine days before Christmas.

397.    McCormick filed a charge of discrimination with the EEOC on February 15, 2021.

398.    As a direct and proximate cause of ULA's discriminatory actions, McCormick's finances were significantly and negatively impacted.

399.    In addition to financial loss, McCormick suffered emotional and psychological harm while still employed at ULA from the months of uncertainty and repeated coercion to abandon his sincere religious beliefs in order to preserve his livelihood and career, all related to his unlawful

termination. As a result of the discriminatory treatment he experienced, McCormick suffered from

emotional distress which is or has been marked by feelings of despondency, social anxiety, loss of

interest in leisure activities, and feelings of agitation, and irritability.

400.    Following his unlawful termination, McCormick suffered emotional and psychological

harm from the months of unemployment and continued coercion by ULA to violate his religious

beliefs.

401.    ULA also actively interfered with McCormick's unemployment claim. In the months

leading up to the deadline, ULA made it clear that if McCormick did not receive the vaccine, he

would be terminated. ULA also made it clear they would file the unemployment as "voluntary

resignation" and McCormick would not be eligible for unemployment benefits. After ULA

terminated McCormick, he applied for unemployment benefits. McCormick worked diligently for

over two years but never received unemployment benefits.

### Michael Norwood

402.    Plaintiff Michael "Lance" Norwood ("**Norwood**") was employed by ULA for eight

years. He worked as a mechanical engineer at ULA's Decatur, Alabama production facility.

403.    Norwood performed well in his role, was qualified for his job, and had an exceptional

performance record.

404.    Norwood is a Christian. As a Christian, Norwood believes all human beings are made

in the image in God. As a Christian, Norwood believes life begins at fertilization and ends at

natural death. Norwood also believes the unjust taking of a human life is murder. As a Christian,

Norwood believes murder is a sin.

405.    Norwood's understanding is that the manufacturers of the COVID-19 vaccine used

aborted fetal tissue, the lining of aborted fetal tissue, or both forms of fetal tissue in the

development of the COVID-19 vaccines. Some COVID-19 vaccines also use aborted fetal cells in the vaccine itself.

406.    Norwood sincerely believes taking COVID-19 vaccines that utilize aborted fetal cells would make him a participant in the unjust murder of unborn children. Therefore, Norwood believes it is a sin to take a vaccine that uses or was developed using aborted fetal cells. Norwood believes to take such a vaccine would be a sin. As a Christian, Norwood believes willfully committing a sin is an afront to God that has both temporal and eternal consequences.

407.    After prayer and reflection, Norwood was placed under the firm conviction that injecting any available COVID-19 vaccines into his body would violate his Christian faith.

408.    Norwood provided a detailed religious accommodation request to ULA describing his religious conflict on September 20, 2021. The company never questioned the religious sincerity of his conflict with vaccination and, in subsequent proceedings, verified that it had validated that all members of the Religious Class had presented religious objections to vaccination that triggered the company's Title VII duty to accommodate short of undue hardship.

409.    ULA's accommodation committee denied Norwood's religious accommodation request, as alleged above.

410.    ULA pretextually refused to offer or otherwise provide these options because of Norwood's disfavored religious beliefs.

411.    There were multiple no-cost and/or less than de minis cost accommodation options available that ULA could have provided to Norwood. Specifically, ULA could have required Norwood to be tested prior to entering facilities or performing any other role ULA determined required in-person contact. At the time of Norwood's termination, testing was available for free

throughout the country. Norwood also would have willingly paid out of pocket for testing in order to retain his job.

412.    ULA did not address any other low-cost and no-cost alternative reasonable accommodations available, including but not limited to: recognition of natural immunity, enhanced safety protocols, continued telework, or any combination of these options.

413.    During the COVID-19 pandemic, from December 2020 (when COVID-19 vaccines became available) through October 2021, Norwood contributed to the ongoing operation and success of ULA while unvaccinated and while preserving his religious convictions. Norwood performed his job remotely or with enhanced safety protocols for approximately 18 months. According to ULA's return to work policy, Norwood was only required to work in the office one day per week.

414.    ULA provided functional accommodations, consistent with Norwood's religious convictions, during this period and allowed Norwood to work unvaccinated while observing enhanced safety protocols. These safety protocols included a six-foot social distancing policy; mask requirements; sanitizer was made easily available and encouraged; daily temperature checks before entering the facility unless the employee was vaccinated; and a general limitation of two people per company vehicle.

415.    Norwood would have accepted any reasonable accommodation ULA would have offered as a condition of continued employment.

416.    ULA did not engage in any interactive process calculated towards finding a reasonable accommodation, which the company would have identified had it engaged in a good faith accommodation process.

417.    ULA placed Norwood on an involuntary leave of absence on October 29, 2021.

418.    ULA then terminated Norwood because of his sincerely held religious beliefs on November 11, 2021

419.    When Norwood was terminated, he possessed natural immunity against COVID-19 through prior infection and recovery.

420.    Norwood filed a charge of discrimination with the EEOC on January 4, 2022.

421.    As a direct and proximate cause of ULA's discriminatory actions, Norwood's finances were significantly and negatively impacted.

422.    In addition to financial loss, Norwood suffered emotional and psychological harm while still employed at ULA from the months of uncertainty and repeated coercion to abandon his sincere religious beliefs in order to preserve his livelihood and career, all related to his unlawful termination. As a result of the discriminatory treatment he experienced, Norwood suffered from emotional distress which is or has been marked by feelings of despondency, social anxiety, loss of interest in leisure activities, and feelings of agitation, and irritability.

423.    Following his unlawful termination, Norwood suffered emotional and psychological harm from the months of unemployment and continued coercion by ULA to violate his religious beliefs.

424.    ULA also actively interfered with Norwood's unemployment claim. In the months leading up to the deadline, ULA made it clear that if Norwood didn't receive the vaccine, he would be terminated. ULA also made it clear they would file the unemployment as "voluntary resignation" and Norwood would not be eligible for unemployment benefits. Because of this, Norwood did not apply for unemployment benefits because he assumed he would be ineligible if ULA file his case as "voluntary resignation." Norwood was also concerned about ULA's hostility towards those who were terminated for religious accommodations.

**Emily Padilla**

425.    Plaintiff Emily Padilla ("**Padilla**") worked for ULA for over 2 years. Padilla was employed at ULA as a Subcontract Administrator.

426.    Throughout her career, Padilla performed well in her role, was qualified for her job, and had an exceptional performance record.

427.    Padilla is a Christian. As a Christian, she believes that her body belongs to God and is the Temple of His Holy Spirit. Because of this, she is very careful of what she puts into her body. She believes the COVID-19 vaccines contain aborted fetal cells, toxic chemicals, and heavy metals, which, in her system of religious beliefs, would be a sin to inject into her body.

428.    As a Christian, Padilla believes all human beings are made in the image in God. As a Christian, Padilla believes life begins at fertilization and ends at natural death. Padilla also believes the unjust taking of a human life is murder. As a Christian, Padilla believes murder is a sin.

429.    Padilla's understanding is that the manufacturers of the COVID-19 vaccine used aborted fetal tissue, the lining of aborted fetal tissue, or both forms of fetal tissue in the development of the COVID-19 vaccines. Some COVID-19 vaccines also use aborted fetal cells in the vaccine itself.

430.    Padilla sincerely believes taking COVID-19 vaccines that utilize aborted fetal cells would make him a participant in the unjust murder of unborn children. Therefore, Padilla believes it is a sin to take a vaccine that uses or was developed using aborted fetal cells. Padilla believes to take such a vaccine would be a sin. As a Christian, Padilla believes willfully committing a sin is an afront to God that has both temporal and eternal consequences.

431.    Padilla prayed about this decision and came under strong conviction that injecting a COVID-19 vaccine was against her faith. If she took a COVID-19 vaccine, she would be

jeopardizing her relationship with God, her body, and violating her religious conscious. Padilla has not been taken antibiotics in 14 years and believes that God made her with the perfect immune system, and she does not preemptively interfere with God's design.

432.    Padilla requested a religious accommodation from ULA's COVID-19 vaccination policy because of her strongly held religious beliefs in conflict with receiving a COVID-19 vaccine.

433.    After submitting his accommodation request, Padilla met with an HR representative who verified her religious sincerity in conflict with vaccination.

434.    ULA's accommodation committee denied Padilla's religious accommodation request, as alleged above.

435.    ULA pretextually refused to offer or otherwise provide any accommodation options because of Padilla's disfavored religious beliefs.

436.    There were multiple no-cost and/or less than de minis cost accommodation options available that ULA could have provided to Padilla. Specifically, ULA could have required Padilla to be tested prior to entering facilities or performing any other role ULA determined required in-person contact. At the time of Padilla's termination, testing was available for free throughout the country. Padilla also would have willingly paid out of pocket for testing in order to retain her job.

437.    In addition to the testing accommodation option, there were also multiple other no-cost and/or less than de minis cost accommodation options available that ULA could have provided to Padilla. Padilla was willing to bear any such costs personally in an effort to preserve her career and religious convictions.

438.    ULA did not address several low-cost and no-cost alternative reasonable accommodations available, including but not limited to: recognition of natural immunity, enhanced

safety protocols, telework, schedule swapping with vaccinated employees if in-person meetings requiring proof of vaccination were an actual requirement for the job, or any combination of these options.

439. During the height of the pandemic, from December 2020 (when COVID-19 vaccines became available) through October 2021, Padilla contributed to the ongoing operation and success of ULA while unvaccinated and while preserving her religious convictions.

440. ULA provided functional accommodations, consistent with Padilla's religious convictions, during this period and allowed Padilla to work unvaccinated while observing enhanced safety protocols. These safety protocols included some combination of six-foot social distancing policy; mask requirements; sanitizer was made easily available and encouraged; daily temperature checks before entering the facility unless the employee was vaccinated; and a general limitation of two people per company vehicle.

441. Padilla's sincerely held religious beliefs in conflict with vaccination could have been accommodated without any undue burden whatsoever and Padilla would have accepted any of the numerous reasonable accommodation options.

442. ULA did not engage in any interactive process calculated towards finding a reasonable accommodation, which the company would have identified had it engaged in a good faith accommodation process.

443. ULA placed Padilla on an involuntary leave of absence on October 29, 2021.

444. ULA terminated Padilla on November 12, 2021, for upholding her religious beliefs and practices in conflict with the Mandate.

445. ULA replaced Padilla with a woman named Penny, and then a woman named Danni, both without any religious conflict with receiving a COVID-19 vaccine.

446.    As a direct and proximate cause of ULA's discriminatory actions, Padilla's finances were significantly and negatively impacted.

447.    In addition to financial loss, Padilla suffered emotional and psychological harm while still employed at ULA from the months of uncertainty and repeated coercion to abandon her sincere religious beliefs in order to preserve her livelihood and career, all related to her unlawful termination. As a result of the discriminatory treatment she experienced, Padilla suffered from emotional distress which is or has been marked by some combination of feelings of despondency, social anxiety, loss of interest in leisure activities, and feelings of agitation, and irritability.

448.    Following her unlawful termination, Padilla suffered emotional and psychological harm from the months of unemployment and continued coercion by ULA to violate her religious beliefs.

449.    Padilla filed for unemployment on November 13, 2021, which was granted on January 24, 2022. ULA challenged the unemployment qualification alleging that Padilla voluntarily resigned. This caused a review of the finding for unemployment benefits, which was upheld.

450.    ULA, again, challenged this finding, which lead to a hearing on May 2, 2022. Again, the officer found in Padilla's favor.

**Philip Vandiver**

451.    Plaintiff Philip Brent Vandiver ("**Vandiver**") was employed by ULA for over 16 years. He worked as an Aerospace Production Technician (Welder) at ULA's Decatur, Alabama production facility.

452.    Vandiver performed well in his role, was qualified for his job, and had an exceptional performance record.

453.    Vandiver is a Christian. As a Christian, Vandiver believes all human beings are made in the image in God. As a Christian, Vandiver believes life begins at fertilization and ends at natural death. Vandiver also believes the unjust taking of a human life is murder. As a Christian, Vandiver believes murder is a sin.

454.    Vandiver's understanding is that the manufacturers of the COVID-19 vaccine used aborted fetal tissue, the lining of aborted fetal tissue, or both forms of fetal tissue in the development of the COVID-19 vaccines. Some COVID-19 vaccines also use aborted fetal cells in the vaccine itself.

455.    Vandiver sincerely believes taking COVID-19 vaccines that utilize aborted fetal cells would make him a participant in the unjust murder of unborn children. Therefore, Vandiver believes it is a sin to take a vaccine that uses or was developed using aborted fetal cells. Vandiver believes to take such a vaccine would be a sin. As a Christian, Vandiver believes willfully committing a sin is an afront to God that has both temporal and eternal consequences.

456.    After prayer and reflection, Vandiver was placed under the firm conviction that injecting any available COVID-19 vaccines into his body would violate his Christian faith.

457.    Vandiver provided a detailed religious accommodation request to ULA describing his religious conflict on or about October 29, 2021. ULA did not conduct an interactive review of Vandiver's exemption request because it was filed after ULA's arbitrary deadline. The company never questioned the religious sincerity of his conflict with vaccination and in subsequent proceedings verified that it had validated that all members of the Religious Class had presented religious objections to vaccination that triggered the company's Title VII duty to accommodate short of undue hardship.

458.    ULA pretextually refused to offer or otherwise provide these options because of Vandiver's disfavored religious beliefs.

459.    There were multiple no-cost and/or less than de minis cost accommodation options available that ULA could have provided to Vandiver. Specifically, ULA could have required Vandiver to be tested prior to entering facilities or performing any other role ULA determined required in-person contact. At the time of Vandiver's termination, testing was available for free throughout the country. Vandiver also would have willingly paid out of pocket for testing in order to retain his job.

460.    ULA did not address any other low-cost and no-cost alternative reasonable accommodations available, including but not limited to: recognition of natural immunity, enhanced safety protocols, continued telework, or any combination of these options.

461.    During the height of the pandemic, from December 2020 (when COVID-19 vaccines became available) through October 2021, Vandiver contributed to the ongoing operation and success of ULA while unvaccinated and while preserving his religious convictions.

462.    ULA provided functional accommodations, consistent with Vandiver's religious convictions, during this period and allowed Vandiver to work unvaccinated while observing enhanced safety protocols. These safety protocols included a six-foot social distancing policy; mask requirements; sanitizer was made easily available and encouraged; daily temperature checks before entering the facility unless the employee was vaccinated; and a general limitation of two people per company vehicle.

463.    Vandiver would have accepted any reasonable accommodation ULA would have offered as a condition of continued employment.

464.    ULA did not engage in any interactive process calculated towards finding a reasonable accommodation, which the company would have identified had it engaged in a good faith accommodation process.

465.    ULA placed Vandiver on involuntary leave, without pay, on November 1, 2021.

466.    ULA terminated Vandiver on December 23, 2021, two days before Christmas, for upholding his religious faith in conflict with the Mandate.

467.    When Vandiver was terminated, he possessed natural immunity against COVID-19 through prior infection and recovery.

468.    Vandiver filed a charge of discrimination with the EEOC on March 6, 2022.

469.    As a direct and proximate cause of ULA's discriminatory actions, Vandiver's finances were significantly and negatively impacted.

470.    In addition to financial loss, Vandiver suffered emotional and psychological harm while still employed at ULA from the months of uncertainty and repeated coercion to abandon his sincere religious beliefs in order to preserve his livelihood and career, all related to his unlawful termination. As a result of the discriminatory treatment he experienced, Vandiver suffered from emotional distress which is or has been marked by feelings of despondency, social anxiety, loss of interest in leisure activities, and feelings of agitation, and irritability.

471.    Following his unlawful termination, Vandiver suffered emotional and psychological harm from the months of unemployment and continued coercion by ULA to violate his religious beliefs. Vandiver had just started construction on his new home right before being terminated by ULA. Vandiver also has a son with Down's Syndrome. Being terminated by ULA resulted in significant increase in medical insurance coverage for Vandiver's son.

472.    ULA also actively interfered with Vandiver's unemployment claim. In the months leading up to the deadline, ULA made it clear that if Vandiver did not receive the vaccine, he would be terminated. ULA also made it clear they would file the unemployment as "voluntary resignation" and Vandiver would not be eligible for unemployment benefits.

473.    After ULA terminated Vandiver, he applied for unemployment benefits. However, he did not receive any unemployment pay until approximately two years after being terminated because ULA filed his unemployment at "voluntary resignation."

### Doug VonFeldt

474.    Plaintiff Douglas VonFeldt ("**VonFeldt**") worked for Lockheed Martin over 11 years and was transferred to ULA. He worked for ULA for over 14 years. VonFeldt's pension service time was transferred over to ULA when he was transferred. VonFeldt was employed at ULA as a Sr. Business Analyst.

475.    Throughout his career, VonFeldt performed well in his role, was qualified for his job, and had an exceptional performance record.

476.    VonFeldt believes that the Good Lord created him in his image and that he cannot alter His Design. To do so would be a sin in his religious system of beliefs.

477.    VonFeldt requested a religious accommodation from ULA's COVID-19 vaccination policy because of his strongly held religious beliefs in conflict with receiving a COVID-19 vaccine.

478.    After submitting his accommodation request, VonFeldt met with an HR representative who verified his religious sincerity in conflict with vaccination.

479.    ULA's Accommodation Committee denied VonFeldt's religious accommodation request, as alleged above.

480.    ULA pretextually refused to offer or otherwise provide any accommodation options because of VonFeldt's disfavored religious beliefs.

481.    There were multiple no-cost and/or less than de minis cost accommodation options available that ULA could have provided to VonFeldt. Specifically, ULA could have required VonFeldt to be tested prior to entering facilities or performing any other role ULA determined required in-person contact. At the time of VonFeldt's termination, testing was available for free throughout the country. VonFeldt also would have willingly paid out of pocket for testing in order to retain his job.

482.    In addition to the testing accommodation option, there were also multiple other no-cost and/or less than de minis cost accommodation options available that ULA could have provided to VonFeldt. VonFeldt was willing to bear any such costs personally in an effort to preserve his career and religious convictions.

483.    ULA did not address several low-cost and no-cost alternative reasonable accommodations available, including but not limited to: recognition of natural immunity, enhanced safety protocols, telework, schedule swapping with vaccinated employees if in-person meetings requiring proof of vaccination were an actual requirement for the job, or any combination of these options.

484.    During the height of the pandemic, from December 2020 (when COVID-19 vaccines became available) through October 2021, VonFeldt contributed to the ongoing operation and success of ULA while unvaccinated and while preserving his religious convictions.

485.    ULA provided functional accommodations, consistent with VonFeldt's religious convictions, during this period and allowed VonFeldt to work unvaccinated while observing enhanced safety protocols. These safety protocols included some combination of six-foot social

distancing policy; mask requirements; sanitizer was made easily available and encouraged; daily temperature checks before entering the facility unless the employee was vaccinated; and a general limitation of two people per company vehicle.

486. VonFeldt's sincerely held religious beliefs in conflict with vaccination could have been accommodated without any undue burden whatsoever and VonFeldt would have accepted any of the numerous reasonable accommodation options.

487. Upon information and belief, Geoff Green was assigned VonFeldt's duties after VonFeldt's termination, who does not have religious objections to receipt of a COVID-19 vaccine.

488. ULA did not engage in any interactive process calculated towards finding a reasonable accommodation, which the company would have identified had it engaged in a good faith accommodation process.

489. ULA placed VonFeldt on an involuntary leave of absence on October 30, 2021.

490. ULA terminated VonFeldt on November 18, 2021, for upholding his religious beliefs and practices in conflict with the Mandate.

491. As a direct and proximate cause of ULA's discriminatory actions, VonFeldt's finances were significantly and negatively impacted. Among other damages, VonFeldt had a vested pension with ULA, which was lost due to ULA's unlawful termination.

492. In addition to financial loss, VonFeldt suffered emotional and psychological harm while still employed at ULA from the months of uncertainty and repeated coercion to abandon his sincere religious beliefs in order to preserve his livelihood and career, all related to his unlawful termination. As a result of the discriminatory treatment he experienced, VonFeldt suffered from emotional distress which is or has been marked by some combination of feelings of despondency, social anxiety, loss of interest in leisure activities, and feelings of agitation, and irritability.

493.    Following his unlawful termination, VonFeldt suffered emotional and psychological harm from the months of unemployment.

**Brian Weden**

494.    Plaintiff Brian Weden ("**Weden**") worked as a contractor for ULA for 18 months and as a direct employee of ULA for seven months. Weden was employed at ULA as a Quality Engineering Leader 5.

495.    Throughout his career, Weden performed well in his role, was qualified for his job, and had an exceptional performance record. He was listed as a "Hi Pot," which meant high potential employee.

496.    Weden is a Christian and has sincere religious beliefs that preclude him from receiving the available COVID-19 vaccines. Specifically, Weden believes it is his responsibility, given to him by God, to protect his body as it is God's temple, which in his personal system of religious beliefs, includes refraining from placing spiritually unclean substances into his body.  After thought and prayer, Weden was convicted that the COVID-19 vaccines are spiritually unclean and therefore that he must not inject them into his body. As a Christian who believes strongly in the sanctity and value of human life, Weden cannot participate in activities illicitly connected to abortion. The COVID-19 vaccines, in Mr. Weden's system of beliefs, are tainted by abortion. The harvesting of DNA and compounds from other life forms, be it animals or aborted babies, and subsequent derivation of pharmacological technologies, or direct injection of these harvested compounds and DNA, is incompatible with Weden's religious belief system.

497.    Weden's wife shares his religious beliefs in conflict with receiving vaccines.  Ms. Weden works in the Neuro Department at Centura Health, a healthcare facility. Ms. Weden submitted a religious accommodation request to her employer's Influenza vaccination mandate on

November 2, 2020, which was granted on November 5, 2020. Ms. Weden reapplied for an exemption to her employer's COVID-19 vaccine mandate once instituted, which was also granted. Ms. Weden's religious beliefs were accommodated while working in a healthcare facility without any undue burden to Centura Health through regular testing and enhanced safety protocols. Notably, Ms. Weden, as part of her job duties worked with a population group that was relatively more vulnerable to COVID-19 than Mr. Weden.

498.    Weden requested a religious accommodation from ULA's COVID-19 vaccination policy because of his strongly held religious beliefs in conflict with the Mandate.

499.    After submitting his accommodation request, Weden met with an HR representative who verified his religious sincerity in conflict with vaccination.

500.    ULA's Accommodation Committee denied Weden's religious accommodation request, as alleged above.

501.    ULA pretextually refused to offer or otherwise provide any accommodation options because of Weden' disfavored religious beliefs.

502.    There were multiple no-cost and/or less than de minis cost accommodation options available that ULA could have provided to Weden. Specifically, ULA could have required Weden to be tested prior to entering facilities or performing any other role ULA determined required in-person contact. At the time of Weden's termination, testing was available for free throughout the country. Weden also would have willingly paid out of pocket for testing in order to retain his job.

503.    In addition to the testing accommodation option, there were also multiple other no-cost and/or less than de minis cost accommodation options available that ULA could have provided to Weden. Weden specifically outlined a variety of accommodation options and even the purported

accommodation costs in his appeal, which were de minimis, and Weden was willing to bear any such costs personally in an effort to preserve his career and religious convictions.

504.    ULA did not address several low-cost and no-cost alternative reasonable accommodations available, including but not limited to: recognition of natural immunity, enhanced safety protocols, telework, schedule swapping with vaccinated employees if in-person meetings requiring proof of vaccination were an actual requirement for the job, or any combination of these options.

505.    During the height of the pandemic, from December 2020 (when COVID-19 vaccines became available) through October 2021, Weden contributed to the ongoing operation and success of ULA while unvaccinated and while preserving his religious convictions.

506.    ULA provided functional accommodations, consistent with Weden's religious convictions, during this period and allowed Weden to work unvaccinated while observing enhanced safety protocols. These safety protocols included some combination of six-foot social distancing policy; mask requirements; sanitizer was made easily available and encouraged; daily temperature checks before entering the facility unless the employee was vaccinated; and a general limitation of two people per company vehicle.

507.    Weden's sincerely held religious beliefs in conflict with vaccination could have been accommodated without any undue burden whatsoever and Weden would have accepted any of the numerous reasonable accommodation options.

508.    Weden was also leading the First Time Quality Initiative at the time of his termination. Weden and the rest of the First Time Quality team were tasked with interviewing other employees to provide ULA feedback in order to align employee values with company values. Weden's colleague, Scott Major, attempted to interview one member of the Religious Accommodation

Committee but was told in an email that the interview would have to wait until November. Amy Logsdon specifically stated "I have to get through clear out of all unvaccinated folks before I can do this. We are in a crunch." This email was sent approximately 8 hours before Weden received his religious accommodation request denial.

509.    ULA did not engage in any interactive process calculated towards finding a reasonable accommodation, which the company would have identified had it engaged in a goo faith accommodation process.

510.    Weden was part of regular leadership discussion where COVID-19 metrics were displayed and discussed. He specifically recalls direct reports of his that were vaccinated and calling out sick during the relevant time frame. Weden believes these sick days were, in part, due to COVID-19 positive results and side effects from the vaccine itself or booster doses of the COVID-19 vaccine.

511.    ULA placed Weden on an involuntary leave of absence on October 30, 2021.

512.    ULA terminated Weden on November 19, 2021.

513.    ULA imposed the involuntary leave and then terminated Weden because he acted in accord with his sincerely held religious beliefs.

514.    When Weden was terminated, his manager, William Heyd, assumed his job duties. Mr. Heyd did not have religious objections to receipt of a COVID-19 vaccine. Due to ongoing building renovations at the time of Weden's, Mr. Heyd assumed Weden's job duties in a fully remote capacity until the renovations were completed, estimated at the time of Weden's termination to be April of 2022.  Like Heyd, Weden could have performed the requisite duties remotely. But ULA refused to make that plainly available accommodation because the company was motivated to rid itself of the maximum number of employees with religious objections to vaccination as possible.

515.    As a direct and proximate cause of ULA's discriminatory actions, Weden's finances were significantly and negatively impacted.

516.    In addition to financial loss, Weden suffered emotional and psychological harm while still employed at ULA from the months of uncertainty and repeated coercion to abandon his sincere religious beliefs in order to preserve his livelihood and career, all related to his unlawful termination. As a result of the discriminatory treatment he experienced, Weden suffered from emotional distress which is or has been marked by some combination of feelings of despondency, social anxiety, loss of interest in leisure activities, feelings of agitation, and irritability, and depression.

517.    Following his unlawful termination, Weden lost wages and employment benefits during a period of unemployment, suffered emotional and psychological harm from the months of unemployment and continued coercion by ULA to violate his religious beliefs.

518.    Weden also reapplied for positions in ULA following his termination in December of 2021. He advised ULA that he would be requesting a religious accommodation to the COVID-19 vaccination policy. Weden submitted his religious accommodation request in accordance with the direction given to him. On December 22, 2021, Weden received an email that his request for a reasonable accommodation was denied. ULA wrote to Weden that "ULA will not allow former employees who have been denied an accommodation to create an end-around to the accommodation and appeals process by re-applying shortly after separation. As such, the original appeal decision to deny the requested accommodation stands."

## CLASS ALLEGATIONS

519.    Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of themselves and on behalf of all other persons similarly situated.

520.    Plaintiffs Joshua Bondeson, Zachary Breland, Sherrie Maine, Ricky Mason, Jaime McCormick, Michael Norwood, Philip B. Vandiver, Christopher Byrd, Benjamin Eastman, Cory Kannegieter, Shawn Laabs, Emily Padilla, Richard Mack, Skyler Bunce, Doug VonFeldt, Brian Weden, and Matthew Bigelow (referred to herein as "**Plaintiffs**" or "**Religious Plaintiffs**") seek to represent themselves and those similarly situated (i.e., the "**Religious Class**").

521.    The proposed Class is described in full below, with Plaintiffs reserving all rights.

**The Religious Class**

522.    ULA subjected Religious Plaintiffs and the Religious Class to a uniform pattern and practice of religious discrimination and retaliation.

523.    From the top levels of the company, ULA instituted and enforced a 100% no religious accommodation policy. However, ULA was willing to accommodate those with medical needs requiring accommodation.

524.    ULA received approximately 109 requests for religious accommodation to its vaccination mandate. After analyzing each request, determined that each requester in the Religious Class held a sincere religious belief in conflict with the Mandate that triggered the company's Title VII obligations to accommodate short of undue hardship.

525.    ULA decided that it would not accommodate any single Religious Class member, regardless of their essential job duties, location, natural immunity, access to free or low cost COVID-19 testing, remote work status, ability to work remotely, and/or any individual circumstances.

526.    Rather, ULA determined the purported collective burden of accommodating the Religious Class would constitute an undue burden. Therefore, under ULA's discriminatory logic,

no employee was eligible for a religious accommodation, because too many employees required religious accommodation.

527.    The effect of ULA's unlawful corporate policy was that each member of the Religious Class's Title VII rights were contingent upon the total number of other ULA employees who sought to assert their Title VII rights.

528.    Regardless, ULA could have accommodated every one of the requests of the Religious Class members without undue hardship, but denied accommodation due to corporate animus against their religious beliefs and practices.

529.    As a result of its predetermined 100% no religious accommodation policy, ULA denied every religious accommodation request for Religious Plaintiffs and every putative Religious Class member.

530.    After rejecting over 100 religious accommodation requests, ULA insisted that Religious Plaintiffs and members of the Religious Class abandon their sincerely held religious beliefs if they desired to preserve their career.

531.    As a result of ULA's unlawful pattern and practice of rejecting religious accommodation requests, Religious Class members faced the ongoing coercion resulting from the immense societal and financial pressure, the prospect of unemployment in a difficult job market.

532.    In these specific circumstances, the blanket denial of religious accommodation requests constituted adverse employment action because ULA made the unlawful decision to analyze the requests as whole instead of conducting an individualized analysis, and then engaged in an ongoing coercion campaign to attempt Religious Class members to violate their religious beliefs.

533.    Many members of the Religious Class were ultimately terminated, an additional adverse employment action.

534.    ULA forced other members of the Religious Class to violate their religious convictions and to receive a COVID-19 vaccine to preserve their careers, an additional adverse employment action.  Members of the Religious Class who ULA coerced into abandoning their sincerely held religious beliefs will live with the consequences of ULA's coercion for the rest of their lives.

535.    Religious Plaintiffs, on behalf of themselves and those similarly situated, propose the following definition, subject to amendment as appropriate, for the Religious Class:

> **Religious Class:**
>
> **All ULA employees who: (1) submitted a religious exemption request to the Mandate; (2) Defendant explicitly acknowledged its Title VII obligation to accommodate short of undue hardship; and (3) and subsequently suffered adverse employment action based in part because Defendant asserted accommodating their religious beliefs alongside other employees who submitted a religious exemption request would constitute a collective undue burden on its business.**

536.    Plaintiffs reserve the right to modify or amend the definition of the proposed Class before moving for class certification and before the Court determines whether certification is appropriate.

537.     The proposed class meets the criteria for certification under Fed. R. Civ. P. 23 (a) and (b).   Issue certification under Rule 23(c)(4) may also be appropriate, should the Court deem necessary.

## **Religious Class Rule 23 Allegations**

538.    Numerosity: The class members are so numerous that joinder of all members is impracticable. ULA has facilities in Alabama, Colorado, Florida, California, and Texas. Though the exact number of class members is unknown at this time, ULA took adverse employment actions against at least 109 employees through: (1) denying their religious accommodation requests based on an asserted, though pretextual, collective undue burden rationale; (2) repeatedly coercing

Religious Class members to violate their sincerely held religious beliefs  (which ULA acknowledged) in conflict with vaccination; (3) through terminating some Religious Class members who declined to abandon their sincerely held religious beliefs; and (4) by retaliating against Religious Class members because too many sought religious accommodation. Based on information and belief, the Religious Class consists of more than 100 current and former employees of ULA who sought religious accommodation to the Mandate, had their sincere religious beliefs in conflict affirmed by ULA, and suffered adverse employment action due to ULA's decision that they would not accommodate a single religious accommodation request. The identities of the class members are ascertainable through ULA's records, class members' records, publication notice, self-identification, or other means. Upon information and belief, in addition to the named Plaintiffs, there are many known putative class members.  Identifiable putative class members, and there are many more, include the following individuals: Aaron Deason, David Spear, Mike Williams, Theresa La Chica, Michelle Kipp, Bob Howard, Jacon Mueller, Karolyn Caprera, Jeff DeKruif, John Hochaver, Diane Eckhoff, Natalie Faber, Suzanne Rebeterano, Jenny Rivera, Melissa Seitler, Jamison Prien, George Budris, and Heath Warden.

539.    Commonality: There are questions of law and fact common to the Religious Class which predominate over any questions affecting only individual class members. The common questions of law and fact include, without limitation:

a)   Whether ULA engaged in the conduct alleged herein;

b)   Whether ULA instituted a 100% no religious accommodation policy, but allowed for medical accommodations;

c)   Whether requiring Religious Class Members to comply with the Mandate violated Title VII and evidenced disparate treatment discrimination, regardless of whether

the company could provide reasonable accommodations without undue hardship, because ULA knew or should have known that the mandated COVID-19 vaccines were incapable of preventing transmission or infection, and knew or should have known that its vaccinated employees were contracting and spreading COVID-19 at very high rates during the relevant timeframes;

d)  Whether ULA instated a medical exemption and accommodation process that favored secular reasons for non-vaccination above religious reasons for non-vaccination;

e)  Whether ULA knew or should have known that its vaccinated employees were contracting COVID-19 at the similar or higher rates than its unvaccinated religious employees during the relevant timeframes;

f)  Whether ULA knew or should have known that the vaccine it required was not effective in preventing vaccinated persons from contracting COVID-19;

g)  Whether ULA knew or should have known during the relevant timeframe that regular testing was a more effective countermeasure against COVID-19 than vaccination;

h)  Whether ULA knew or should have known that tests for COVID-19 infection were available at low or no costs throughout the country and where ULA operated its business;

i)  Whether ULA knew, or should have known, that recognition of natural immunity was a suitable and equally, if not more effective, alternative to COVID-19 vaccination that would not have entailed any cost to ULA to allow as a religious accommodation option;

j)   Whether ULA had recognized natural immunity as a form of protection against COVID-19 infection, then abandoned that recognition in the process of imposing its vaccination mandate;

k)   Whether ULA instituted a religious exemption/accommodation process that refused to account for each employee's individual circumstances;

l)   Whether ULA instituted a de facto "no religious accommodation" scheme;

m)  Whether ULA harbors animus towards employees with religious practices that preclude receiving a COVID-19 vaccine and predetermined that its employees with religious practices in conflict with vaccination would be terminated if they declined to violate their religious beliefs, regardless of the employee's individual circumstances;

n)   Whether ULA policy to deny the religious accommodation requests of employees who sought religious accommodation based on a "collective" undue burden that failed to account for each employee's individual circumstances violated Title VII;

o)   Whether ULA pretextually denied religious accommodations to the Religious Class when it could have accommodated them through any of the many low cost and no-cost accommodation options available;

p)   Whether ULA knew at the time it terminated Religious Plaintiffs and other Religious Class members that free testing options were publicly available despite months later claiming, counterfactually, in its EEOC Position Statements that the cost of testing would result in a collective undue hardship;

q)   Whether ULA knew at the time it took adverse employment action against the Religious Plaintiffs and other Religious Class members that free testing options

were going to be made publicly available at no charge through the Federal
Government, despite months later claiming in its EEOC Position Statements that
the cost of testing would result in undue hardship;

r)   Whether ULA pretextually refused to accommodate religious employees because,
based on discriminatory animus towards the religious practice of non-vaccination,
it wanted to rid itself of as many of these disfavored religious employees as
possible;

s)   Whether ULA knew in advance of the Mandate its actions would negatively impact
its religious employees to a statistically significant degree;

t)   Whether ULA knew in advance of its mass termination of religious employees that
its actions would negatively impact its religious employees to a statistically
significant degree;

u)   Whether ULA proceeded with reckless disregard for the Title VII rights of its
religious employees with recognized religious objections to the Mandate;

v)   Whether ULA determined that it would terminate all of its employees who
possessed religious objections to receiving a COVID-19 vaccine, regardless of its
actual ability to provide reasonable accommodations to such employees without
undue hardship;

w)   Whether ULA unlawfully coerced members of the Religious Class to violate the
convictions against vaccination that ULA had already determined were sincerely
held and religious in nature;

x)   Whether ULA retaliated against the Religious Class because too many employees
submitted religious accommodation requests;

y) Whether ULA replaced or transitioned job duties of every Religious Class members it terminated with employees who did not possess religious objections to vaccination;

z) Whether ULA knew or should have known at the time it took adverse employment action against members of the Religious Class that its vaccinated employees were contracting and spreading COVID-19 at similar, or higher rates than its unvaccinated employees;

aa) Whether, before denying Religious Class members' requests for accommodations, ULA performed an individualized assessment of each Religious Class member's accommodation request to actually determine its ability to accommodate without undue hardship;

bb) Whether ULA had financial incentives (or penalties) tied to contracts with the federal government that pretextually influenced the shaping, implementation, and ultimate results of the religious accommodation process, rather than a good-faith individualized assessment of whether the company could accommodate each individual applicant without undue hardship;

cc) Whether ULA decision to terminate unvaccinated religious employees who were working 100% remotely due to ULA office repairs when terminated demonstrates evidence a pattern and practice of religious animus;

dd) Whether ULA implemented security protocols to ensure that all employees claiming to be vaccinated for COVID-19 in fact received the injections and did not submit fake vaccination cards;

ee) Whether ULA only supposedly followed federal guidance related to the vaccines and employment policies (e.g., from the CDC and EEOC) when convenient to enact its discriminatory policies, and declined to follow federal guidelines when doing so would be inconvenient to it discriminatory objectives (e.g., failing to implement a vaccination booster requirement and disregarding EEOC guidance against taking adverse employment action against the Religious Class);

ff) Whether ULA conducted antibody testing of all vaccinated employees to confirm that all who received the COVID-19 vaccine actually elicited an immune response;

gg) Whether ULA engaged in class-wide discrimination against the Religious Class by classifying terminations as "for cause" or "misconduct" so as to preclude their ability to receive unemployment benefits in relevant state unemployment proceedings;

hh) Whether ULA made a pretextual corporate decision to discriminate against the Religious Class by deciding they could not grant any single religious accommodation request if they could not grant all of them after religious employees submitted requests for religious accommodation; and

ii) Whether ULA intentionally ceased its contact tracing protocols after the mass termination of religious employees so as to obfuscate the numbers of those vaccinated employees continuing to contract COVID-19.

540. <u>Typicality</u>: Religious Plaintiffs' claims are typical of those of other putative class members because they each sought religious accommodation to the Mandate, ULA validated that their stated religious beliefs were sincere, religious in nature, and in conflict with vaccination, and suffered adverse employment action. Importantly, ULA, when implementing its mass religious

accommodation denial scheme and thereafter, stated that the decision to deny every religious accommodation was based on "the high volume of requests to accommodate that qualified under the sincerely held belief prong of the analysis." This means that every Religious Class members' claims arose from the same course of discriminatory conduct and more specifically, the same single decision, to deny all religious accommodation requests without any type of individualized analysis if ULA could accommodate them without undue hardship.  Further—because it cannot be disputed that the mandated vaccines were incapable of preventing infection and transmission of the targeted pathogen—regular testing is a more accurate and reliable assurance of workplace safety than vaccination.  Free and low COVID-19 testing was available throughout the country during the relevant timeframes. Thus, testing was an accommodation option that applied class-wide, regardless of job duty, an option that should have been implemented for vaccinated and unvaccinated employees alike because ULA cannot dispute that its it vaccinated employees were contracting COVID-19 during the relevant timeframes.  If workplace safety was the goal, testing was the countermeasure to be implemented, and was an accommodation option that would have been less than a de minimis burden to implement.

541.    <u>Adequacy of Representation:</u> Religious Plaintiffs will fairly and adequately represent and protect the interests of the Religious Class members. Like members of the putative class, they sought religious exemption and accommodation, had the sincerity and religious conflict with vaccination validated, and were subjected to ULA's class-wide discriminatory policies and suffered adverse employment action. Plaintiffs' Counsel is competent and experienced in litigating class actions and is experienced in civil rights and employment litigation of this kind.

542.    <u>Predominance:</u>  ULA has engaged in a common course of conduct towards Religious Plaintiffs and the Religious Class, in that they all were subjected to the same overarching Mandate,

had the religious sincerity of their objections to the Mandate affirmed by ULA, and suffered adverse employment action. Importantly, ULA, unequivocally and at the time of the mass religious accommodation request denial, expressed that the decision to deny every religious accommodation was based on "the high volume of requests to accommodate that qualified under the sincerely held belief prong of the analysis." Further, whether ULA could have implemented regular testing for the Religious Class short of undue burden regardless of job role is a common question that predominates. The common questions of fact and law arising from ULA's discriminatory conduct affecting the Religious Class members outlined in this Complaint predominate over any individual issues and can be resolved through common answers to those questions. ULA failed to engage in any individualized analysis of whether each individual Religious Class members' requested accommodation would amount to an undue hardship, and ULA could have accommodated every putative class member short of undue hardship—regardless of job role—through any of the low cost and no-cost accommodation options available (most notably, COVID-19 testing). Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

543.    <u>Superiority</u>.    A Class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to the inevitable individual actions resulting in piecemeal litigation across multiple jurisdictions resulting in variance individual claims, especially here when Plaintiffs will make analogous claims and Defendant will present the same exact "collective undue burden" defense. Absent class certification, Religious Class Members would find that the cost of litigating their individual claims against a joint venture of two of the biggest aerospace and defense contractors in the country to be prohibitively high and would therefore be without remedy. Class action in a

single district (in this case the Northern District of Alabama where venue is appropriate) will provide some consistency and uniformity of remedy among class members and avoid inconsistent standards applied to ULA's conduct. The prosecution of single actions by individual Class members in other districts would create a risk of inconsistent or varying adjudications with respect to individual class members, which would establish incompatible standards of conduct for ULA. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources, and the parties' resources, and protects the rights of each Class member. Notably, because Tina Wiggs was working from this judicial district and played the integral role in the religious accommodation review board and the decision to mass deny religious accommodation requests based on a collective undue burden justification, venue is proper in the Norther District of Alabama for every employee who the religious accommodation review board evaluated. *See* 42 U.S.C. § 2000e-5(f)(3) (venue is proper in any district court in a state where the alleged Title VII violation occurred, or in the "district in which the employment records relevant to" to the discrimination are maintained).  A class action is superior to litigating potentially a multitude of claims in this district, and other judicial districts, actions that are based on the same set of operative facts and the same corporate religious accommodation scheme.

## CLAIMS FOR RELIEF

## <u>COUNT I</u>

**Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. Religious Discrimination – Failure to Accommodate**

***(On behalf of Religious Plaintiffs and Religious Class Members)***

544.    Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

545.    This claim is brought by the Religious Plaintiffs for themselves and on behalf of the Religious Class. Religious Plaintiffs have filed timely charges with the EEOC indicating that ULA engaged in a pattern and practice of discrimination against at least 109 employees.  Plaintiffs Emily Padilla and Rich Mack gave ULA notice in their filed EEOC charges of their intent to file a representative action relating to ULA's widespread pattern and practice of religious discrimination. Multiple of these plaintiffs, including Plaintiff Padilla and Plaintiff Mack, have received a Notice of Right to Sue from the EEOC.

546.    In addition to the pattern and practice of religious discrimination detailed throughout, ULA more specifically engaged in a comprehensive pattern and practice of religious discrimination through refusing to accommodate at least 109 of its religious employees, even though there were many no-cost and low-cost accommodation options available.

547.    Testing was a low-cost/no-cost accommodation option that was available regardless of job role.  Critically, this was also a more effective countermeasure against COVID-19 than vaccination. This is because ULA cannot dispute that its vaccinated employees were contracting COVID-19 at high rates during the relevant timeframes.

548.    Because ULA knew the strong majority of COVID-19 cases recorded within its workforce from July of 2021 through November of 2021—as well as an unacceptable relative proportion of positive cases—were attributable to its vaccinated employees, not unvaccinated religious employees, the circumstances surrounding the Mandate's implementation and the mass denial of religious accommodation requests gives rise to strong inferences of ULA' unlawful motives to rid itself of employees with disfavored religious beliefs and practices.

549.    ULA took adverse employment action against Religious Plaintiffs and those similarly situated "because of" their disfavored religious beliefs. ULA took adverse employment action

against Religious Plaintiffs and those similarly situated because the company was motivated to avoid accommodating religious practices in conflict with COVID-19 vaccination.

550.    Title VII imparts "favored treatment" to religious employees. A company is free to institute facially neutral policies (such as a vaccination mandate) as an ordinary matter. But when an employee requires an accommodation as an aspect of religious practice, it is no response that the subsequent adverse employment action was due to an otherwise-neutral policy. Title VII requires otherwise-neutral policies to give way to the need for an accommodation. *EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768 (2015).

551.    ULA's animus against its religious employees was expressed by ULA CEO Bruno in his Town Hall meeting sent to all ULA employees.

552.    On October 26, 2021, Lianne George, Vice President, Human Resources, emailed ULA Leaders and stated that, "ULA determined that approving the high number of religious accommodations would result in an undue hardship to the company; all religious requests were denied on this basis of undue hardship. (**Please note the hardship analysis differs for medical accommodations**)."[14] George took time to reiterate that "All religious [accommodation] requests were denied on this basis of undue hardship.  None were approved."[15]

553.    ULA engaged in a comprehensive scheme of religious discrimination due to its refusal to accommodate the Religious Class's religious objections to vaccination.

554.    As part of this unlawful scheme, ULA failed to perform an individual accommodation analysis for each individual class member to determine if accommodating them would result in an

---

[14] *See* **Exhibit 9**, October 26, 2021, email from Liane George, ULA Vice President, Human Resources, to All ULA Leaders. (Emphasis added)

[15] *Id.*

undue burden, even though many low cost and no-cost accommodation options were available, and every member of the Religious Class could have been accommodated short of undue hardship.

555.    To establish a prima facie claim for failure to accommodate a plaintiff must present evidence that: (1) his sincere and bona fide religious belief conflicted with an employment requirement, and (2) his employer took adverse employment action against him because of his inability to comply with the employment requirement or because of the employer's perceived need for his reasonable accommodation. *Bailey v. Metro Ambulance Services*, 992 F.3d 1265, 1275 (11th Cir. 2021). The Eleventh Circuit has recognized that a plaintiff's burden to establish a prima facie case "is not onerous." *Walden v. Centers for Disease Control & Prevention*, 669 F.3d 1277, 1293 (11th Cir. 2012).

556.    Once a plaintiff establishes a prima facie case under a failure to accommodate theory, an employer can evade liability if it shows accommodating the employee's religious beliefs and practices would constitute an "undue burden" on its business. Id.

557.    The Supreme Court's recent ruling in *Groff v. DeJoy*, 143 S. Ct. 2279 (2023) makes clear that when attempting to establish its undue burden defense, an "employer must show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business." *Id*. at 2295 (internal citations omitted). When evaluating whether an accommodation would constitute an undue burden, employers must take into account all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, size and operating cost of an employer. Thus, "courts should resolve whether a hardship would be substantial in the context of an employer's business in the common-sense manner that it would use in applying any such test." *Id*.

558.    Religious Plaintiffs and Religious Class members hold sincere religious beliefs in conflict with receiving a COVID-19 vaccine and were therefore precluded from complying with the Mandate.

559.    Religious Plaintiffs and members of the Religious Class informed ULA of their sincere religious beliefs through requesting religious accommodations to ULA vaccination mandate.

560.    After assessing every religious exemption and accommodation request to evaluate the religious sincerity of each request, ULA determined that each Religious Class member's religious exemption request qualified under the sincerely held belief prong of the analysis.

561.    Said differently, ULA determined that the Religious Class was entitled to protection under Title VII because they each presented a sincerely held religious belief that precluded compliance with the Mandate.

562.    ULA determined that it had a Title VII duty to accommodate the Religious Class short of undue hardship.

563.    ULA conceded the sincerity and religious nature of Religious Plaintiffs and Religious Class members' stated beliefs in conflict with vaccination in its "Reasonable Accommodation Decision Form".

564.    ULA again conceded the sincerity and religious nature of Religious Plaintiffs' and Religious Class members' religious accommodation requests in position statements submitted to the EEOC.

565.    ULA took adverse employment action against members of the Religious Class. Being fired is an adverse employment action, but any other action by an employer that falls short of actually terminating the employee can constitute an adverse action if it "in some substantial way, alter[s] the employee's compensation, terms, conditions, or privileges of employment, deprive[s]

her of employment opportunities, or adversely affect[s] her status as an employee." *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008) (quoting *Gupta v. Fl. Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000)). To be considered adverse, the action must cause "a serious and material change in the terms, conditions, or privileges of employment." *Id.* at 970-71.

566.    Title VII "does not require proof of direct economic consequences in all cases," but "the asserted impact cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment." *Davis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001). This Court applies an objective test and asks "whether a reasonable person in the plaintiff's position would view the employment action in question as adverse." *Hinson v. Clinch Cnty., Ga. Bd. of Educ.*, 231 F.3d 821, 829 (11th Cir. 2000).

567.    ULA took adverse employment action against Religious Plaintiffs and members of the Religious Class on multiple fronts.  First, the denial of the religious accommodation requests, and the ongoing coercion targeting members of the Religious Class to violate their religious beliefs, in these specific circumstances, constitutes adverse employment action.  *See, e.g.*, *Sambrano v. United Airlines, Inc.*, No. 21-11159 (5th Cir. Feb. 17, 2022) (recognizing the "ongoing coercion" of being forced to choose either to violate religious convictions in conflict with receiving a COVID-19 vaccine, "or to lose pay indefinitely" because of a protected characteristic "constitutes irreparable harm", and a unique and particularly egregious type of adverse employment action).

568.    Forcing employees ULA recognized had sincere religious beliefs in conflict with vaccination to violate their religious integrity, when the company knew its vaccinated employees were contracting COVID-19 at high rates, caused material changes in the terms and conditions of employment that an objectively reasonable person would find to be adverse. *See, e.g., Abram v.*

*Fulton Cty. Gov't*, 598 F. App'x 672, 676 (11th Cir. 2015) (holding that an employer's failure to grant a requested accommodation "involved [a] discrete act[] of alleged discrimination"); *see also Taylor v. C&B Piping, Inc.*, No. 2:14-cv-01828 (N.D. Ala. Mar. 20, 2017) (finding that denial of a request for an accommodation under the ADA constituted a discrete act of discrimination). Further, the circuit courts that have addressed the denial of an accommodation request in the ADA context have held that "[a]n employer's denial of a request for a reasonable accommodation . . . is a discrete act of discrimination." *Dick v. Dickinson State Univ.*, 826 F.3d 1054, 1059 (8th Cir. 2016); *see also Cherosky v. Henderson*, 330 F.3d 1243, 1245-47 (9th Cir. 2003) (denial of employee's request for a respirator is a discrete act of discrimination); *Elmenayer v. ABF Freight Sys., Inc.*, 318 F.3d 130, 134-35 (2d Cir. 2003) (denial of a request for a religious accommodation constituted a discrete act of discrimination).

569.    Second, ULA took additional adverse employment action against members of the Religious Class by denying their appeals of the denial of their religious accommodation requests. Through these appeals, ULA was, on multiple occasions, explicitly advised that they were engaging in unlawful conduct and were violating Title VII by, among other means, justifying the denial of religious accommodations based on counterfactual and unlawful rationales; by failure to conduct individualized assessment of religious accommodation possibilities, and thereby willfully and knowingly ignoring the many different ways ULA could have accommodated without any burden whatsoever; by treating medical accommodation requests more favorably than religious accommodation requests; by willfully and knowingly refusing to recognize superior efficacy of natural immunity and regular testing as low cost and no cost accommodation options; and by refusal to integrate the reality of demonstrated vaccine failure into its religious accommodation process.

570.    Third, ULA took additional adverse employment action against many members of the Religious Class when it executed its mass termination scheme in or about November of 2021.

571.    After failing to conduct an individualized assessment of whether it could accommodate each employee short of undue hardship, ULA blanket denied religious accommodation requests based on a collective undue burden justification. The blanket denial of the religious accommodation request accompanied by a blanket assertion of hardship stands in contrast to ULA's individualized assessment of sincerely held religious beliefs. This contrast is additional evidence that ULA made its mass "no accommodation" decision because it was "motivated" to avoid providing accommodations to employees with disfavored religious practices precluding vaccination. *See EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 774 (2015) (holding that Title VII's disparate treatment provision "prohibits actions taken with the motive of avoiding the need for accommodating a religious practice").

572.    ULA CEO Bruno stated in a ULA-company communication that he personally believed an unvaccinated person was responsible for the death of his father-in-law. But Bruno could not have known from whom his father-in-law contracted COVID-19. Importantly, at the time, Bruno knew that vaccinated persons were capable of contracting and spreading COVID-19, as he also explicitly stated in his Town Hall Meeting presentation. In August 2021—before Defendant instituted the Mandate—then head of the CDC, Rochelle Walensky, publicly announced that the vaccines were incapable of preventing infection and transmission.[16]

---

[16] *See* CNN, *Fully Vaccinated People Who Get a Breakthrough Infection Can Transmit the Virus,* (August 5, 2021), available at https://edition.cnn.com/us/live-news/coronavirus-pandemic-vaccine-updates-08-05-21/h_d2accec79fdc37f422d02c536828ea1e (CDC Director Walensky stating that the COVID-19 vaccines worked "with regard to severe illness and death… [b]ut what they c[ouldn]'t do anymore is prevent transmission." (Last accessed May 24, 2024)).

573.    The vacuous nature of Bruno's assertion demonstrates his animus against anyone with religious practices in conflict with vaccination, including against every member of the Religious Class.  Bruno's animus was woven into the fabric of ULA's religious accommodation policies, evidenced by the 100% denial rate of religious accommodation requests. At the top levels of the company, based on counterfactual justifications, ULA made clear its disdain for those who declined to receive a vaccine, including those with religious beliefs and practices in conflict with vaccination. At the top level of the company, based on the motivation to avoid accommodating disfavored religious practices, it was decided that no religious accommodations would be tolerated.

574.    Medical exemptions and accommodations, however, were treated more favorably.  On information and belief, ULA granted medical exemptions and accommodations, demonstrating its willingness and ability to accommodate exemptions to its vaccination mandate for favored reasons. Medical accommodations were given using the same reasonable accommodation options requested by the Religious Class.

575.    ULA could have accommodated the Religious Plaintiffs and Religious Class members without undue burden through many low cost and no-cost options, including but not limited to: (1) a COVID-19 testing requirement for all employees, vaccinated and unvaccinated alike (which, because vaccinated employees were contracting and spreading COVID-19 during the relevant timeframes, is a more accurate and reliable indicator of COVID-19 infection and therefore a more effective countermeasure against transmission and infection than vaccination), (2) temporary telework, (3) enhanced safety protocols, (4) voluntary schedule swapping with vaccinated employees or employees demonstrating a negative COVID-19 test in the rare event in-person contact was required as a core job function; (5) recognition of natural immunity, or (6) through any combination of the above options.

576.    Religious Plaintiffs and the Religious Class Members were able to perform the core functions of their jobs throughout the pandemic while unvaccinated. They were highly productive and qualified employees who were increasing ULA's profits throughout the pandemic. They were able to continue to do so without being vaccinated, and/or with reasonable accommodation.

577.    Despite claims by ULA that testing costs were unsustainable and an undue burden due to the cost, ULA had actual or constructive knowledge that free testing was available for Religious Class members during the relevant timeframe, and that religious employees were willing to personally incur the costs of testing, if even necessary, to preserve their careers.

578.    Further, upon information and belief, ULA had actual or constructive knowledge that tests would soon become available for free through the Federal Government and would have been no additional expense to ULA.

579.    Any claim of purported administrative burdens associated with tracking testing results or positive COVID-19 infections is likewise pretextual. Because vaccinated employees were responsible for the majority of COVID-19 positive cases during the relevant timeframes, any claimed administrative costs related to testing and tracking positive cases were disproportionately associated with vaccinated employees, not the Religious Class members.

580.    Accordingly, the circumstances surrounding the Mandate's institution, the mass, uniform accommodation denial, and the mass termination scheme, give rise to strong inferences of religious discrimination. Simply put, ULA was not going to accommodate members of the Religious Class under any circumstances, and its justifications for the mass denial of religious accommodations was in furtherance of the company's, including Bruno's, strong "motivations" to avoid accommodating the disfavored religious practices of members of the Religious Class. *Abercrombie*, 575 U.S. at 774.

581.    ULA was specifically advised by attorneys that their corporate policy to deny accommodation to each individual who qualified for a reasonable accommodation under Title VII by asserting his religious conflict with receipt of a COVID-19 vaccine was unlawful.

582.    Considering the foregoing, Religious Plaintiffs and members of the Religious Class were terminated "because of" their disfavored religious beliefs and practices.

583.    ULA engaged in an intentional, company-wide, and systematic policy, pattern, and practice of religious discrimination against the Religious Class. Without lawful justification, ULA pretextually determined, as a corporate policy, it could not accommodate any member of the Religious Class and decided to purge as many religious employees as it possibly could while using the Mandate and its unlawful religious accommodation process as its chosen vehicles to accomplish its unlawful goals.

584.    Because ULA cannot provide legitimate justification for its actions, the foregoing conduct constitutes illegal, discrimination prohibited under Title VII.

585.    ULA's actions were willful, wanton, and/or malicious, and demonstrate reckless disregard for the rights of Religious Plaintiffs and the Religious Class members under Title VII. As such, punitive damages are warranted.

586.    Further, as a direct and proximate consequence of ULA's discriminatory conduct, Religious Plaintiffs and members of the Religious Class have suffered and are suffering economic and pecuniary damages for which they are entitled to judgment.

587.    In addition, as a direct and proximate consequence of ULA's actions, the Religious Plaintiffs and the Religious Class have suffered and are suffering non-pecuniary damages in the form of emotional suffering, coercion, humiliation, embarrassment, and mental anguish for which they are entitled to recover compensatory damages in an amount to be determined by the jury.

588.    Accordingly, Plaintiffs request relief as hereinafter described.

## COUNT II

**Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.
Religious Discrimination – Disparate Treatment Religious Discrimination**

***(On behalf of Religious Plaintiffs and Religious Class Members)***

589.    Religious Plaintiffs are also able to establish a comprehensive pattern and practice of religious discrimination under a traditional disparate treatment religious discrimination theory.

590.    To prove a claim of religious discrimination under a disparate treatment theory, Plaintiffs must show (1) they are members of a protected class; (2) they were subjected to adverse employment action; (3) ULA treated similarly situated employees more favorably; and (4) they were qualified to do the job.'" *EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1286 (11th Cir. 2000) quoting *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir.1999).

591.    Religious Plaintiffs and those similarly situated are members of a protected class. ULA acknowledged their protected statuses immediately after they submitted religious exemption and accommodation requests, and has continuously affirmed the protected statuses of employees the company denied religious accommodations in subsequent legal proceedings.

592.    As detailed throughout, members of the Religious Class suffered multiple instances of adverse employment action.

593.    On October 26, 2021, Lianne George, Vice President, Human Resources, emailed ULA Leaders and stated that, "ULA determined that approving the high number of religious accommodations would result in an undue hardship to the company; all religious requests were

denied on this basis of undue hardship. (**Please note the hardship analysis differs for medical accommodations**)" (emphasis added).[17]

594.    Ms. George specifically noted that a different "hardship analysis" applied to medical accommodations when dealing with the exact same health and safety contagion risk.

595.    Members of the Religious Class were treated less favorably than employees with secular, medical objections to receipt of a COVID-19 vaccine. Further, many members of the Religious Class were replaced by members outside of the relevant protected class (employees without religious objections to vaccination). Finally, the circumstances in this case indicate a comprehensive pattern and practice of discrimination against religious employees. ULA knew or should have known that the mandated vaccines were not safe or effective by any reasonable or objective measure, knew or should have known that its vaccinated employees were contracting COVID-19 at very high rates during the relevant timeframes, knew or should have known that natural immunity against COVID-19 was superior to artificial immunity derived from vaccination and through its business records knew that many of Religious Class possessed natural immunity, yet the company took adverse employment action against more than 100 employees with religious beliefs and practices in conflict with vaccination on the counterfactual rationales that "workplace safety" demanded a near 100% vaccination rate and that the mandated vaccines were "safe and effective."

596.    Members of the Religious Class were qualified for their jobs and performed their job duties very well throughout the pandemic.

---

[17] *See* **Exhibit 9**, October 26, 2021, email from Liane George, ULA Vice President, Human Resources, to All ULA Leaders.

597.    Upon information and belief, ULA granted medical accommodation requests at higher rates than religious accommodation requests.

598.    Upon information and belief, ULA granted more medical accommodations than religious accommodations to the Mandate.

599.    Upon information and belief, ULA provided the same accommodations requested by the Religious Class to those with medical conflicts with the Mandate.

600.    ULA treated those with secular objections to receipt of a COVID-19 vaccine more favorably than those with religious objections to a COVID-19 vaccine.

601.    ULA knew on the date it instituted the Mandate that the required vaccines did not prevent transmission or infection of COVID-19, as publicly stated by prominent public health officials throughout the country.

602.    Thus, the Mandate was instituted not for workplace safety, but as a convenient tool to purge the maximum number employees with disfavored religious practices.

603.    ULA also knew or should have known before it instituted the Mandate that most if not all of the remaining unvaccinated employees in its workforce had refrained from becoming vaccinated due to religious reasons.

604.    ULA also knew at this time that the strong majority of COVID-19 cases recorded within its workforce were attributable to its vaccinated employees, not unvaccinated religious employees.

605.    ULA had also learned through adverse events reported within its workforce and through publicly available reports that the COVID-19 vaccines carried unacceptable rates of adverse events. Regardless, even if ULA had not known of the high percentages of religious employees that would be terminated because of its policies when it instituted the Mandate and did

not fully know the extent of vaccine inefficacy and vaccine related harms at that time, the company was certainly more fully aware of all of the above when it terminated the Religious Plaintiffs and those similarly situated. Nonetheless, Defendant took adverse employment action against the Religious Class based on the pretextual justification that the vaccines were safe and effective.

606.    Accordingly, the circumstances surrounding the Mandate's institution, the mass, uniform accommodation denial, and the mass termination give rise to strong inferences of religious discrimination.

607.    Considering the foregoing, Religious Plaintiffs and members of the Religious Class suffered adverse employment action "because of" their disfavored religious beliefs.

608.    ULA engaged in an intentional, company-wide, and systematic policy, pattern, and practice of religious discrimination against the Religious Class. Without lawful justification, ULA pretextually determined, as a corporate policy, it could not accommodate members of the Religious Class, and decided to purge as many religious employees as it possibly could while using the Mandate and biased religious accommodation process as its chosen vehicles to accomplish its unlawful policies.

609.    Any and all purported legitimate, non-discriminatory justifications for taking adverse employment actions against members of the religious class are pretextual.

610.    Because ULA cannot provide legitimate justification for its actions, the foregoing conduct constitutes illegal, intentional discrimination prohibited under 42 U.S.C. § 2000e-2 et seq.

611.    ULA's actions were willful, wanton, and/or malicious, and demonstrate reckless disregard for the rights of Religious Plaintiffs and the Religious Class members under Title VII. As such, punitive damages are warranted.

612.    Further, as a direct and proximate consequence of ULA's discriminatory conduct, Religious Plaintiffs and members of the Religious Class have suffered and are suffering economic and pecuniary damages for which they are entitled to judgment.

613.    As a direct and proximate consequence of ULA' discriminatory conduct, Religious Plaintiffs and members of the Religious Class have suffered and are suffering economic and pecuniary damages for which they are entitled to judgment.

614.    In addition, as a direct and proximate consequence of ULA's actions, the Religious Plaintiffs and members of the Religious Class have suffered and are suffering non-pecuniary damages in the form of emotional suffering, ongoing coercion to violate their religious integrity, humiliation, embarrassment, and mental anguish for which they are entitled to recover compensatory damages in an amount to be determined by the jury.

615.    Accordingly, Plaintiffs request relief as hereinafter described.

## COUNT III

**Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*
Religious Discrimination – Disparate Impact**

**(*On behalf of the Religious Plaintiffs and Religious Class Members*)**

616.    Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

617.    Title VII authorizes two causes of action against employers: disparate treatment (intentional discrimination) and disparate impact. *Abercrombie,* 575 U.S. at 771.

618.    The "disparate impact theory prohibits *neutral* employment practices which, while non-discriminatory on their face, visit an adverse, disproportionate impact on a statutorily-protected group." *EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1274 (11th Cir. 2000) (citing *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971).

619.    "A disparate impact claim targets an employment practice that has an actual, though not necessarily deliberate, adverse impact on protected groups." *EEOC v. Catastrophe Mgmt. Sols.*, 852 F.3d 1018, 1024 (11th Cir. 2016) (citing *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009).

620.    "The doctrine seeks the removal of employment obstacles, not required by business necessity" that disproportionately harm protected groups. *Joe's Stone Crab*, 220 F.3d at 1274 (citing *Griffin v. Carlin*, 755 F.2d 1516, 1524 (11th Cir.1985)).

621.    Plaintiffs must show a "significant statistical disparity" that disadvantaged the protected group, "a specific, facially-neutral, employment practice which is the alleged cause of the disparity," and "a causal nexus exists between the specific employment practice identified and the statistical disparity shown." *Id*. (cleaned up).

622.    Disparate impact claims do not require a showing of discriminatory intent. *Joe's Stone Crab*, 220 F.3d at 1278.

623.    The Mandate, while facially neutral, served to eliminate most, if not all, ULA employees who refused to abandon their religious objections to receiving a COVID-19 vaccine. It did not eliminate medical objections. This obviously generated a statistically significant disparity. ULA's business records will demonstrate the precise level of unlawful disparity the Mandate had on religious employees when compared to relevant comparator proportions.

624.    When it instituted the Mandate, ULA knew or should have known that a very large percentage of its unvaccinated workforce had declined vaccination for religious reasons. When it instituted the Mandate, ULA also knew that the mandated vaccines did not stop transmission or infection.

625.    Therefore, ULA knew that by the time it implemented the Mandate that the policy would disproportionately impact the Religious Class and that the medical procedure it compelled

would only, at best, provide a level of personal protection, and was incapable of stopping the spread of COVID-19.

626.    Said differently, ULA knew the number of employees that would be terminated if they upheld their sincere religious beliefs in conflict with the Mandate.

627.    By October 21, 2021, ULA knew the total number of religious employees impacted by the Mandate and knew the Mandate would have a statistically significant and negative impact on the Religious Class if ULA refused to accommodate those employees.

628.    Religious Plaintiffs and Religious Class Members hold sincere religious beliefs that preclude them from receiving a COVID-19 vaccine and informed ULA of this through their respective requests for religious accommodation to the Mandate. ULA verified the religious sincerity of the Religious Plaintiffs and the Religious Class and was well-aware before terminating Religious Plaintiffs and members of the Religious Class that the Mandate and its policies related thereto would have a dramatic, negative, and statistically significant impact on employees with religious practices in conflict with vaccination.

629.    ULA's compulsory vaccination policy, both in its imposition and the subsequent accommodations process, resulted in an unlawful and statistically significant disparity of resulting adverse employment actions between employees with religious objections to receiving a COVID-19 vaccine, and those who did not.

630.    Alternatively, in the event another comparator is utilized, the Mandate generated an unlawful and significantly discriminatory impact on Religious Plaintiffs and the Religious Class.

631.    When it implemented the Mandate, ULA knew or should have known that a statistically significant disparity existed between its unvaccinated religious employees unable to comply with the Mandate, and secular employees who were able to comply with the Mandate.

632.    The Mandate was not job-related. Religious Plaintiffs and Religious Class members successfully performed the essential functions of their jobs while unvaccinated throughout the height of the pandemic. Other ULA employees performed the essential functions of their jobs while unvaccinated throughout the height of the pandemic. It is not debatable on the date ULA decided to deny all the Religious Class members' accommodation requests that the mandated vaccines were incapable of preventing transmission or infection, thus, the "workplace safety" justification was not job-related when adverse employment action was taken.  In short, the Mandate was a job preference divorced from the essential functions of the Religious Plaintiffs' jobs and therefore was not job-related.

633.    It is not debatable on the date ULA decided to terminate members of the Religious Plaintiffs and members of the Religious Class that the mandated vaccines were incapable of preventing transmission or infection, thus, the "workplace safety" justification was not job-related when Religious Plaintiffs and members of the Religious Class were terminated. Again, at this point, the Mandate was a job preference divorced from the essential functions of the Religious Plaintiffs' jobs and therefore was not job-related.

634.    Nor was the Mandate consistent with business necessity. ULA's failure to regularly test vaccinated individuals for COVID-19—despite its business records demonstrating that vaccinated employees comprised the overwhelming majority of COVID-19 infections within the company during the relevant timeframes—shows the asserted business justification of workplace safety and intent to mitigate the spread of COVID-19 were inauthentic. Any employer derived benefit flowing from the Mandate was peripheral to ULA's operations and the Religious Plaintiffs and Religious Class members' essential duties.

635.    Thus, the "workplace safety" justification is pretext, and cannot support a legitimate business necessity defense.

636.    Even if an employer rebuts the plaintiff's prima facie case for disparate impact discrimination, "a plaintiff may still succeed by showing that the employer refuses to adopt an available alternative employment practice that has less disparate impact while still serving the employer's legitimate needs." *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 277 (4th Cir. 2005) (citing 42 U.S.C. § 2000e-2(k)(1)(A)(i)). In that situation, the plaintiff will have shown that the employer's alleged business necessity is "mere pretext for discrimination." *Id*.

637.    Many alternative employment practices were available that would have achieved ULA's purported business purposes underlying the Mandate. As alternatives to termination, ULA could have required regular testing for unvaccinated employees (which is a much more reliable indicator of possible transmission and workplace safety than vaccination, and realistically, should have applied to all employees regardless of vaccination status), recognized natural immunity as an accommodation option or as satisfying the Mandate's immunization requirement, required enhanced safety protocols of unvaccinated religious employees,  granted temporary remote work arrangements, or any combination of these options.

638.    Moreover, ULA's failure to implement rigorous safety protocols applicable to its vaccinated employees, despite clear evidence of their contagion risk during the relevant period, further delegitimizes any assertion of business necessity.

639.    ULA's removal of hyperfocus on contact tracing policies subsequent to the mass termination despite ongoing and significant rates of COVID-19 infections amongst its vaccinated workforce—severely undermines any assertion of workplace safety as a legitimate business purpose for the Mandate. Moreover, ULA's irrational actions in terminating safety protocols for

all employees after executing its mass termination, with knowledge of high infection rates in its vaccinated workforce—while trumpeting its commitment to "workplace safety"—gives rise to a strong inference of a bad faith attempt to cover up the failures of and the counterfactual justifications for the Mandate.

640.  The foregoing conduct, in addition to the allegations throughout this Complaint, constitutes unlawful disparate impact discrimination under 42 U.S.C. §2000e-2 et seq.  Plaintiffs are therefore entitled to declaratory and equitable relief.

641.  In addition, as a direct and proximate consequence of ULA's actions, the Religious Plaintiffs and the Religious Class have suffered non-pecuniary damages in the form of emotional suffering, humiliation, embarrassment, and mental anguish for which they are entitled to recover compensatory damages in an amount to be determined as this case proceeds to the extent permitted under applicable law.

642.  As a direct and proximate result of ULA' discriminatory actions, Religious Plaintiffs and members of the Religious Class are suffering the injuries and damages hereinafter described. Accordingly, Plaintiffs request relief as hereinafter described and legally available.

## COUNT IV

**Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e-3(a)
Religious Discrimination – Class-Based Retaliation**

**(*On behalf of the Religious Plaintiffs and Religious Class Members*)**

643.  Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

644.  This claim is brought by the Religious Plaintiffs for themselves and on behalf of the Religious Class. Religious Plaintiffs have filed timely charges with the EEOC indicating that ULA engaged in a pattern and practice of discrimination and retaliation against at least 109 employees.

119

Further, Plaintiff Emily Padilla and Plaintiff Richard Mack filled EEOC charges notifying the EEOC and ULA of their intent to file a representative action relating to ULA's widespread pattern and practice of religious discrimination and widespread retaliation. Multiple of these plaintiffs, including Plaintiff Padilla and Plaintiff Mack, have received a Notice of Right to Sue from the EEOC.

645.    ULA violated Title VII by retaliating against the Religious Class when ULA, instead of individually analyzing whether each individual employee's accommodation created an undue burden, universally and uniformly decided that they would not grant a single religious accommodation request.

646.    A prima facie claim of retaliation requires a showing that Plaintiffs "engaged in activity protected by Title VII, (2) that an adverse employment action occurred, and (3) that a causal link existed between the protected activity and the adverse action." *Bailey v. Metro Ambulance Servs.*, 992 F.3d 1265, 1268 (11th Cir. 2021).

647.    Title VII "provides protection to an employee who 'has opposed any practice made an unlawful employment practice by this subchapter.' 42 U.S.C. § 2000e-3(a). The opposition clause protects activity that occurs before the filing of a formal charge with the EEOC, such as filing an internal complaint of discrimination with an employer or informally complaining of discrimination to supervisors." *Maryam v. Capsule*, 2023 U.S. Dist. LEXIS 156863 at *n4 (N.D. Ga. June 15, 2023)(citing *Pipkins v. City of Temple Terrace, Fla.*, 267 F.3d 1197, 1201 (11th Cir. 2001)).

648.    To qualify for the protection of the statute, the manner in which an employee expresses her opposition to an allegedly discriminatory employment practice must be reasonable. *Rollins v. Fla. Dep't of Law Enf't*, 868 F.2d 397, 401 (11th Cir. 1989).

649.    The burden of causation can be met by showing close temporal proximity between the statutorily protected activity and the adverse employment action. *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007).

650.    Religious Plaintiffs and those similarly situated engaged in a protected activity under Title VII when they sought religious accommodation to the Mandate.

651.    Members of the Religious Class also engaged in a protected activity when they appealed the religious accommodation denial, specifically, when they informed Defendant in their appeals that Defendant was abrogating its duties under Title VII and engaging in illegal conduct, an objectively reasonable method to oppose discrimination.

652.    As detailed throughout, members of the Religious Class all suffered adverse employment action.

653.    The adverse employment actions occurred close temporal proximity to requesting Religious Accommodation (less than three months from engaging in protected activity).

654.    The decision to deny every Religious Class Members' religious accommodation requests, an adverse employment action, came on October 21, 2021, within a month and a half of submission of their religious accommodation requests.

655.    The decision to deny every Religious Class Members' religious accommodation request is an adverse employment action because ULA failed to individually analyze whether the requested accommodation would impose an undue burden on ULA. Instead, ULA made a corporate decision that it would deny every religious accommodation request because it believed that it was unable to grant every accommodation request, which, in any event, is not accurate. In other words, ULA retaliated against the entire Religious Class because too many of them requested religious accommodation.

656.    Religious Plaintiffs and Religious Class Members were terminated within approximately one month of their appeals to the denial of their religious accommodation requests.

657.    Because ULA cannot provide legitimate justification for its actions, the foregoing conduct constitutes retaliation prohibited under 42 U.S.C. § 2000e-3(a)

658.    ULA's actions were willful, wanton, and/or malicious, and demonstrate reckless disregard for the rights of Religious Plaintiffs and the Religious Class members under Title VII. As such, punitive damages are warranted.

659.    Further, as a direct and proximate consequence of ULA's discriminatory conduct, Religious Plaintiffs and members of the Religious Class have suffered and are suffering economic and pecuniary damages for which they are entitled to judgment.

660.    In addition, as a direct and proximate consequence of ULA's actions, the Religious Plaintiffs and the Religious Class have suffered and are suffering non-pecuniary damages in the form of emotional suffering, humiliation, embarrassment, and mental anguish for which they are entitled to recover compensatory damages in an amount to be determined by the jury.

661.    Accordingly, Plaintiffs request relief as hereinafter described.

### **PRAYER FOR RELIEF**

WHEREFORE, Religious Plaintiffs and the Religious Class, pray for relief as follows:

A. Order ULA to make whole all individuals adversely affected by the unlawful employment practices described above, by providing the affirmative relief necessary to eradicate the effects of their unlawful employment practices, including but not limited to instatement, reinstatement, provide front pay in lieu of reinstatement, or otherwise make whole individuals denied employment because of their religion;

B.  Declare that ULA violated Title VII for failure to provide reasonable accommodations to the Religious Class;

C.  Declare ULA violated Title VII by treating employees similarly situated to members outside the protected class more favorably than the Religious Class members;

D.  Declare ULA violated Title VII by engaging in disparate impact discrimination against the Religious Class;

E.  Declare ULA violated Title VII by retaliating against the Religious Class;

F.  Certify the Religious Class under Federal Rule of Civil Procedure 23 (a) (b), and certain discrete issues under Rule 23(c)(4) where appropriate;

G.  Designate Plaintiffs Joshua Bondeson, Zachary Breland, Sherrie Maine, Ricky Mason, Jaime McCormick, Michael Norwood, Philip B. Vandiver, Christopher Byrd, Benjamin Eastman, Cory Kannegieter, Shawn Laabs, Emily Padilla, Richard Mack, Skyler Bunce, Doug VonFeldt, Brian Weden, and Matthew Bigelow as representatives of the Religious Class;

H.  Designate Plaintiffs' Counsel of record as class counsel for the Religious Class;

I.  Enter a declaratory judgment declaring ULA' actions to be violations of Title VII;

J.  Issue a permanent injunction requiring ULA to discontinue engaging in disparate impact discrimination against the Religious Class and to expunge the personnel files of members of the Religious Class of any derogatory, false, or misleading information relating to this matter;

K.  Grant members of members of the Religious Class equitable relief;

L.  Order ULA to provide training for supervisors and managers at all corporate levels specific to Title VII religious discrimination;

M. Award Religious Plaintiffs and members of the Religious Class back pay (including interest and benefits), reinstatement or front pay, pre-judgment and post-judgment interest, and compensatory damages;

N. Award punitive damages under Title VII;

O. Award Plaintiffs reasonable attorneys' fees and costs; and

P. Grant any other relief that the Court deems just, proper, and equitable.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38 and 29 U.S.C. § 626, Plaintiffs demand a jury trial on all issues upon which there is a federal right to a jury trial.

[Intentionally blank. Signatures of Counsel on following page]

[Continued from preceding page]

RESPECTFULLY SUBMITTED this 24th day of May, 2024 by:

*/s/ Caleb Byrd*

Caleb N. Byrd
R. Davis Younts, LLC
Post Office Box 18591
Huntsville, Alabama 35804
Phone: 256-701-8929
caleb@yountslaw.com

Walker D. Moller*
SIRI & GLIMSTAD LLP
1005 Congress Avenue
Suite 925-C36
Austin, TX 78701
Phone: (512) 265-5622
Facsimile: (646) 417-5967
wmoller@sirillp.com

Jack R. Spitz*
SIRI & GLIMSTAD LLP
8 Campus Drive, Suite 105 PMB#161
Parsippany, New Jersey 07054
Phone: 212-532-1091
Facsimile: 646-417-5967
jspitz@sirillp.com

Steve C. Thornton*
Attorney at Law
Post Office Box 16465
Jackson, Mississippi 39236
Phone: (601) 982-0313
mail@lawlives.com

R. Davis Younts*
R. Davis Younts, LLC
26 North 9th Street
Lemoyne, PA 17043
Phone: 833-739-5291
davis@yountslaw.com

Attorneys for Plaintiffs

* *Pro Hac Vice Motions forthcoming*